**UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re: | Case No. 18-14064 |
| JOHN T McMAHAN, | |
| Debtor. | Chapter 7 |
| | Honorable Janet S. Baer |
| LAKE FOREST BANK & TRUST COMPANY, | |
| Plaintiff, | Adv. Pro. No.: 18-00252 |
| v. | |
| JOHN T McMAHAN, | |
| Defendant. | |

**LAKE FOREST BANK & TRUST COMPANY'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to the Court's Order dated October 25, 2023, Adversary Plaintiff, Lake Forest Bank & Trust Company (the "Bank"), submits its Proposed Findings of Fact and Conclusions of Law related to the Adversary Proceeding Trial held on October 25, 2023.

**The Bank's Proposed Findings of Fact**

I.    **Proceedings, Jurisdiction of Court, and Statutory Basis for Amended Complaint.[1]**

1.    On February 24, 2016, the Debtor filed a Voluntary Petition under Chapter 11, Case No. 16-06137 (the "Prior Bankruptcy"). (Ans., Dkt. 31, ¶ 31, admitted by 9/29/23 Order).

2.    The Prior Bankruptcy was dismissed on November 2, 2016 upon the U.S. Trustee's Motion to Dismiss or Convert. (Ans., Dkt. 31, ¶ 34, admitted by 9/29/23 Order).

3.    On or about May 14, 2018, the Debtor filed his Chapter 7 Voluntary Petition in Bankruptcy, in the United States Bankruptcy Court for the Northern District of Illinois, Case No. 18-14064 ("Chapter 7 Bankruptcy").  (Ans., Dkt. 31, ¶ 8, admitted by 9/29/23 Order).

---

[1] "Amd Cmpt" refers to the Bank's First Amended Complaint to Object to Discharge of Debt filed on February 13, 2019, Dkt. 27. "Ans" refers to the Debtor's Answer to First Amended Complaint to Object to Discharge of Debt filed March 26, 2019, Dkt. 31.  The "9/29/23 Order" refers to this Court's Order Granting in Part Plaintiff's Motion to Deny Defendant's Request for Continuance, For Entry of Default Judgment, and/or for Sanctions for Failure to Comply with Court's Pretrial Order, Dkt. 101.   "Tr. Ex." refers to the Plaintiff's trial exhibits by number that were admitted through the Court's 9/29/23 Order or by the Court on October 25, 2023.

4.      On July 20, 2018, Lake Forest Bank & Trust Company filed its Complaint to Object to Discharge of Debt Pursuant to 11 U.S.C. § 727(a)(2)(A).  (Dkt. 1, admitted by 9/29/23 Order).

5.      On February 13, 2019, the Bank filed its First Amended Complaint to Object to Discharge of Debt Pursuant to 11 U.S.C. § 727(a)(2)(A). (Dkt. 28, admitted by 9/29/23 Order).

6.      On March 26, 2019, the Debtor filed his Answer to First Amended Complaint to Object to Discharge of Debt. (Dkt. 31, admitted by 9/29/23 Order).

7.      This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334.  Venue is proper here pursuant to 28 U.S.C. § 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). (Ans., Dkt. 31, ¶ 1, admitted by 9/29/23 Order).

8.      The statutory basis for this Amended Complaint is 11 U.S.C. § 727. (Ans., Dkt. 31, ¶ 2, admitted by 9/29/23 Order).

## I.      Parties and Relevant Entities and People Related to Debtor.

9.      Lake Forest Bank & Trust Company (the "Bank") is a national banking association with its principal place of business in Illinois.  (Amd. Cmpt, Dkt. 27, ¶ 3, admitted by 9/29/23 Order).

10.      On September 30, 2015, the Bank obtained a judgment (the "Judgment") against the Debtor, among others, in the aggregate amount of $1,546,015.56 in the Circuit Court of Cook County, Illinois in the case captioned *Lake Forest Bank and Trust Company vs Northwestern Nasal and Sinus Associates, S.C. a/k/a John T. McMahan, M.D., S.C. and Dr. John T. McMahan*, case No 2014 CH 14584 (the "Lawsuit").  The Judgment was awarded after a contested bench trial. (Ans., Dkt. 31, ¶ 16). (Tr. Ex. 3 and 4)(Admitted by 9/29/23 Order).

11.      The Bank is a creditor of Debtor John T. McMahan (the "Debtor") by way of the Judgment. (Admitted by 9/29/23 Order).

12.      The Debtor is an individual and resident of Illinois.  (Ans., Dkt. 31, ¶ 4, admitted by 9/29/23 Order).

13.      The Debtor is a doctor of Otolaryngology who practices in the Chicago area. (Ans., Dkt. 31, ¶ 5, admitted by 9/29/23 Order).

14.      The Debtor graduated from the University of South Carolina Medical School. (Ans., Dkt. 31, ¶ 6, admitted by 9/29/23 Order).

15.      The Debtor completed his residency in Otolaryngology at Northwestern University in 1977 and completed his fellowship in head and neck oncology at Northwestern University in 1978. (JM Dep. 12-14-18 (Tr. Ex. 72), pp. 86 (ll. 19-24) and 87 (ll. 1-17) , admitted by 9/29/23 Order).

16.      At the time of his filing his Chapter 7 Bankruptcy, the Debtor was a clinical professor at Northwestern University Medical School.  (Ans., Dkt. 31, ¶ 7, admitted by 9/29/23 Order).

17.     Prior to September 2014, Debtor was the sole shareholder and President of Northwestern Nasal and Sinus Associates, S.C. a/k/a John T. McMahan, M.D., S.C. ("Northwestern Nasal"). (Ans., Dkt. 31, ¶ 9, admitted by 9/29/23 Order).

18.     Prior to the Debtor filing Chapter 7 Bankruptcy, Debtor was aware that the Bank had obtained the Judgment against him and Northwestern Nasal and that the Judgment was in excess of $1,000,000.00.  (JM Dep. 1-20-20 (Tr. Ex. 73), pp. 22 (ll. 8-24) and 23 (ll. 1-22), admitted by 9/29/23 Order).

19.     On or about September 1, 2014, Debtor ceased operations of Northwestern Nasal and became the sole shareholder and President of McMahan-Clemis Institute of Otolaryngology, S.C. ("McMahan-Clemis").  (Ans., Dkt. 31, ¶ 9, admitted by 9/29/23 Order).

20.     From on or about September 1, 2014 to the Debtor's filing of his Chapter 7 Bankruptcy, Debtor remained the sole shareholder and only officer, President, of McMahan-Clemis. (Ans., Dkt. 31, ¶ 11)(JM Dep. 11-1-17 (Tr. Ex. 71), p. 9, ll. 3-20, p. 11, ll. 11-13, admitted by 9/29/23 Order).

21.     Debtor was solely responsible for determining if and when McMahan-Clemis would make a shareholder distribution to Debtor and Debtor made that determination whenever he needed money.  (JM Dep. 11-1-17 (Tr. Ex. 71), pp. 59 (ll. 19-24) and 60 (ll. 1-5)).

22.     Dr. Clemis left the practice of McMahan-Clemis in 2016.  (JM Dep. 12-14-18 (Tr. Ex. 72), p. 67, ll. 5-18).

23.     Lynn McMahan is the wife of Debtor John McMahan, having been married since 1991. (JM Dep. 11-01-2017 (Tr. Ex. 71), p. 7, ll. 5-11).

24.     Prior to the Debtor filing Chapter 7 Bankruptcy, Trinity Development II, Inc. ("Trinity Development") was an Illinois corporation with Lynn McMahan as a shareholder and President. (LM Dep. 8-7-19 (Tr. Ex. 68), pp. 11 (ll. 15-24) and 12 (ll. 1-9)).

25.     Prior to the Debtor filing Chapter 7 Bankruptcy, Debtor had little familiarity with Trinity Development, had no ownership interest in Trinity Development and was not an officer, director or employee of Trinity Development. (JM Dep. 12-14-18 (Tr. Ex. 72), pp. 12 (ll. 14-24) and 13 (ll. 1-12).

26.     Prior to the Debtor filing Chapter 7 Bankruptcy,  Dr. McMahan was not an employee of Trinity Development and Debtor was never authorized to act as an agent of Trinity Development and performed no services for Trinity Development.  (LM Dep. 8-7-19 (Tr. Ex. 68), pp. 27 (ll. 13-24) and 28 (ll. 1-22)).

27.     Prior to the Debtor filing Chapter 7 Bankruptcy, Debtor had no duties or responsibilities in relation to Trinity Development and had no involvement whatsoever.  (JM Dep. 12-14-18 (Tr. Ex. 72), p. 14, ll. 7-17).

28.     There is no relationship between McMahan-Clemis and Trinity Development.  (JM Dep. 11-1-17 (Tr. Ex. 71), p. 52, ll. 20-22).

3

29.     Lynn McMahan was never an employee of McMahan-Clemis. (JM Dep. 12-14-18 (Tr. Ex. 72), p. 103, ll. 15-17).

30.     McMahan-Clemis did lease an apartment from Trinity Development for which McMahan-Clemis paid Trinity Development rent in the amount of $4,000.00 per month until approximately May 2017. (JM Dep. 12-14-18 (Tr. Ex. 72), pp. 103 (ll. 21-24) ,104 (ll. 1-24) and 105 (ll. 1-5)).

31.     McMahan-Clemis usually paid the lease payments to Trinity Development by check. (JM Dep 12-14-18 (Tr. Ex. 72), p. 109, ll. 5-16).

32.     Other than the lease payments, McMahan-Clemis never owed any money to Trinity Development. (JM Dep. 12-14-18 (Tr. Ex. 72), p. 103, ll. 18-20).

33.     Trinity Lease Worldwide, LLC is a leasing company with two (2) members, Debtor John McMahan and Lynn McMahan. (JM Dep., 11-1-17 (Tr. Ex. 71), p. 35, ll. 19-24).

## II.     Bank Accounts Affiliated With, Controlled and Used by the Debtor in the Year Prior to Filing Chapter 7 Bankruptcy.

34.     On or about September 9, 2014, Debtor, in his capacity as President of McMahan-Clemis, opened a bank account at Bank of America, an account ending in 0681, in the name of McMahan-Clemis Institute of Otolaryngology, S.C. (the "McMahan-Clemis Account 0681"). (Ans., Dkt. 31, ¶ 12)(Tr. Ex. 64)(JM Dep. 1-20-20 (Tr. Ex. 73), p. 108, ll. 8-24)(admitted by 9/29/23 Order).

35.     McMahan Clemis had two (2) bank accounts, one account was for hearing aids and the other account, McMahan-Clemis Account 0681, was the account primarily used by McMahan-Clemis.  (JM Dep. 11-1-17 (Tr. Ex. 71), pp. 53 (ll. 14-24) and 54 (ll. 1-8)).

36.     During all times prior to the Debtor filing his Chapter 7 Bankruptcy, only the Debtor had signatory authority to the McMahan-Clemis Account 0681. (Ans., Dkt. 31, ¶ 13)(JM Dep. 12-14-18 (Tr. Ex. 72), pp. 110 ( ll. 12-24) and 111 (l. 1), admitted by 9/29/23 Order).

37.     During all times prior to the Debtor filing his Chapter 7 Bankruptcy, only the Debtor had the authority to wire or transfer money from the McMahan-Clemis Account 0681 to any other bank account.  (JM Dep. 1-20-20 (Tr. Ex. 73), pp. 101 (ll. 15-17), 106 (ll. 6-24) and 107 (ll. 1-6)).

38.     During all times prior to the Debtor filing his Chapter 7 Bankruptcy, only the Debtor had a check card for the McMahan-Clemis Account 0681 and only the Debtor had the authority to withdraw cash from the McMahan-Clemis Account 0681. (JM Dep. 1-20-20 (Tr. Ex. 73), pp. 175 (ll. 11-17), 178 (ll. 8-24), 188 (ll. 7-24), 189 (ll. 1-24) and 190 (ll.  1-7)).

39.     During all times prior to the Debtor filing his Chapter 7 Bankruptcy, only the Debtor had the authority to transfer money from the McMahan-Clemis Account 0681 into Debtor's personal account, McMahan Account 1973. (JM Dep. 11-1-17 (Tr. Ex. 71), p. 71, ll. 3-6).

40.     During all times prior to the Debtor filing his Chapter 7 Bankruptcy, only the Debtor had the authority to transfer money from the McMahan-Clemis Account 0681 into the Trinity Development Account 8807. (JM Dep. 1-20-20 (Tr. Ex. 73), pp. 106 (ll. 6-24), 107 (ll. 1-9), 144 (ll. 11-24), 145 (ll. 1-24) and 146 (ll. 1-6)).

41.     Any payment made to Debtor, including any distributions or payment of wages other than compensation that resulted in money transfers from McMahan-Clemis Account 0681 into McMahan Account 1973, were made based upon the decision and authorization of Debtor. (JM Dep. 11-1-17 (Tr. Ex. 71), pp. 70 (ll. 1-24), 71 (ll. 1-24), 72 (ll. 1-24) and 73 (ll. 1-12)).

42.     On or about October 31, 2013, Debtor opened a bank account at Bank of America, an account ending in 8807 (the "Trinity Development Account 8807"), in the name of Trinity Development, II, Inc. ("Trinity Development"), a company in which his wife, Lynn McMahan, was the President. (Tr. Ex. 65)(JM Dep. 1-20-20 (Tr. Ex. 73), pp. 210 (ll. 20-24) and 211 (ll. 1-7)).

43.     When Debtor opened the Trinity Development Account 8807, Debtor used the business address for McMahan-Clemis as the business address for Trinity Development. (JM Dep. 1-20-20 (Tr. Ex. 73), pp. 131 (ll. 23-24) and 132 (ll. 1-20)).

44.     Debtor John McMahan never had authority from Lynn McMahan or Trinity Development to open a bank account in the name of Trinity Development. (LM Dep. 11-14-19 (Tr. Ex. 69), p. 172, ll. 9-15)).

45.     Prior to May 2018, Lynn McMahan was unaware that Debtor John McMahan had opened and was making payments out of the Trinity Development Account 8807. (LM. Dep. 11-14-19 (Tr. Ex. 69), pp. 173 (ll. 5-24) and 174 (ll. 1-22)).

46.     At all times prior to the filing of the Chapter 7 Bankruptcy, Debtor had sole control over the flow of funds in and out of the Trinity Development Account 8807. (JM Dep. 1-20-20 (Tr. Ex. 73), pp. 134 (ll. 19-24), 135 (ll. 1-24), 136 (ll. 1-5) and 211, ll. 8-12).

47.     During all times prior to the Debtor filing his Chapter 7 Bankruptcy, the Debtor had signatory authority to the Trinity Development Account 8807 (Ans., Dkt. 31, ¶ 15, admitted by 9/29/23 Order).

48.     During all times prior to Debtor filing Chapter 7 Bankruptcy, Lynn McMahan had no knowledge of the existence of the Trinity Development Account 8807 and was unaware of whether she had signatory authority for that account. (LM Dep.11-14-19 (Tr. Ex. 69), p. 174 (ll. 5-22)) (JM Dep. 1-20-20 (Tr. Ex. 73), pp. 212 (ll. 19-24), 213 (ll. 1-24) and 214 (ll. 1-4)).

49.     During all times prior to the filing of his Chapter 7 Bankruptcy, only the Debtor could authorize payments or money transfers from either the McMahan-Clemis Account 0681 or the McMahan Account 1973 to Trinity Development Account 8807. (JM Dep. 1-20-20 (Tr. Ex. 73), pp. 106 ((ll. 6-24), 107 (ll. 1-9), 125 (ll. 1-9)).

50.     During all times prior to the filing of his Chapter 7 Bankruptcy, for the majority of the time, the only source of funds going into the Trinity Development Account 8807 were transfers from

the McMahan Account 1973 or the McMahan-Clemis Account 0681. (Tr. Ex. 65) (JM Dep. 1-20-20 (Tr. Ex. 73), pp. 153 (ll. 5-24) and 154 (ll. 1-5)).

51.     During all times prior to the filing of his Chapter 7 Bankruptcy, only the Debtor had a check card (debit card) for Trinity Development Account 8807.  (JM Dep. 1-20-20 (Tr. Ex. 73), pp. 141 (ll. 4-24) and 142 (ll. 1-22)).

52.     During times prior to the filing of his Chapter 7 Bankruptcy, Debtor used the Trinity Development Account 8807 consistently for a number of years. (JM Dep. 1-20-20 (Tr. Ex. 73), pp. 133 (ll. 19-24) and 134 (ll. 1-11)).

53.     During all times prior to the filing of his Chapter 7 Bankruptcy, only the Debtor could make payments out of, transfer money from or make withdrawals from Trinity Development Account 8807. (JM Dep. 1-20-20 (Tr. Ex. 73), pp. 131 (ll. 23-24), 132 (ll. 1-6), 135 (ll. 14-24) and 136 (ll. 1-5)).

54.     Lynn McMahan had no knowledge of any payments being made on behalf of Trinity Development out of the Trinity Development Account 8807 and Lynn McMahan did not authorize Debtor to make any payments on behalf of Trinity Development from the Trinity Development Account 8807.  (LM Dep. 11-14-19 (Tr. Ex. 69), p. 174, ll. 14-22)).

55.     On or about March 17, 2016, the Debtor opened a personal account in his name with Bank of America, an account ending in 1973, which account was still open as of the date of the Debtor's filing of his Chapter 7 Bankruptcy ("McMahan Account 1973"). (Ans., Dkt. 31, ¶ 32)(Tr. Ex. 63)(JM Dep., 1-20-20 (Tr. Ex. 73), pp. 109 (ll. 15-24) and p. 110 (ll. 11-19) , admitted by 9/29/23 Order).

56.     Between May 2017 and May 2018, Debtor only had one (1) personal bank account which was McMahan Account 1973, and he had no joint bank accounts with Lynn McMahan.  (JM Dep., 11-1-17 (Tr. Ex. 71), p. 53, ll. 1-13).

57.     The Debtor had sole control over the flow of funds in an out of the McMahan Account 1973, and was the only individual who could sign checks, transfer or wire money, or use the check card (debit card) associated with the account. (JM Dep., 1-20-20 (Tr. Ex. 73), pp. 106 (ll.6-24), 107 (ll. 1-8), 125 (ll. 1-9).

### III.    The Bank's Citation Proceedings in State Court following the Judgment.

58.     After the Judgment was entered against Debtor in September 2015, Debtor was aware that the Bank would attempt to collect the Judgment against him personally.  (JM Dep. 1-20-20 (Tr. Ex. 73), p. 25, ll. 11-15).

59.     Following entry of the Judgment, the Bank caused several Citations and Third-Party Citations to Discover Assets to be issued to, among others, the Debtor and companies believed to be owned and/or controlled by Debtor and a Citation to Discover Assets to Third Party (Wages) for McMahan-Clemis (the "Citation Proceedings"). (Ans., Dkt. 31, ¶ 17) (Tr. Ex. 5, 7, 10, 13), admitted by 9/29/23 Order).

60.    Debtor retained the law firm of Cohen Raizes & Regal after the Judgment was entered against him in September 2015 to represent him and McMahan-Clemis in the Citation Proceedings filed against them.  (JM Dep. 1-20-20 (Tr. Ex. 73), pp. 59 (ll. 17-24) and 60 (ll. 1-18)).

61.    On October 9, 2015, the Bank issued a Citation to Discover Assets to the Debtor, and on November 10, 2015 the Bank issued an Alias Citation to Discover Assets to the Debtor (the "Alias McMahan Citation").  (Ans., Dkt. 31, ¶ 18) (Tr. Ex. 5), admitted by 9/29/23 Order).

62.    The Alias McMahan Citation contained the following provision:

**YOU ARE PROHIBITED** from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to the judgment debtor or to which the judgment debtor may be entitled or which may be acquired by or become due to the judgment debtor and from paying over or otherwise disposing of any money not so exempt, which is due or becomes due to the judgment debtor, until further order of court or termination of the proceedings. You are not required to withhold the payment of any money beyond double the amount of the judgment.

(Ans., Dkt. 31, ¶ 19)(Tr. Ex. 5), admitted by 9/29/23 Order).

63.    The Alias McMahan Citation was served on McMahan on November 16, 2015.  (Ans., Dkt. 31, ¶ 20) (Tr. Ex. 6), admitted by 9/29/23 Order).

64.    On October 19, 2015, the Bank issued a Third-Party Citation to Discover Assets to McMahan-Clemis (the "McMahan-Clemis Citation"). (Ans., Dkt. 31, ¶ 21) (Tr. Ex. 10), admitted by 9/29/23 Order).

65.    The McMahan-Clemis Citation was served on McMahan-Clemis on October 26, 2015. ((Tr. Ex. 11), admitted by 9/29/23 Order).

66.    On October 19, 2015, the Bank issued a Citation to Discover Assets to Third Party (Wages) for McMahan-Clemis related to the wages of the Debtor (the "McMahan-Clemis Wage Citation").  (Ans., Dkt. 31, ¶ 24) (Tr. Ex. 7), admitted by 9/29/23 Order).

67.    The McMahan-Clemis Wage Citation was served on October 26, 2015. (Tr. Ex. 8, admitted by 9/29/23 Order).

68.    The McMahan-Clemis Wage Citation contained the following provision:

**YOU ARE PROHIBITED** from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from the execution or garnishment belonging to Defendant or to which s/he may be entitled or which may thereafter be acquired by or become due to him or her, and from paying over or otherwise disposing of any moneys not so exempt which are due or become due to the Defendant, up to double the amount of the balance due, until further order of the court or termination of the proceeding, whichever occurs first.

(Ans., Dkt. 31, ¶ 25, Tr. Ex. 7, admitted by 9/29/23 Order).

69.     On November 24, 2015, the Bank issued an Alias Citation to Discover Assets to a Third-Party on Trinity Development which was served on Trinity Development with notice served on the Debtor. (Tr. Exs. 13-15, admitted by 9/29/23 Order).

70.     In response to a Citation to Discover Assets to a Third-Party (Wages), McMahan-Clemis filed the completed Interrogatories/Answers to Wage Deduction Proceedings and Calculation to Determine Amount of Withholding, which had a signed Respondent Certification, signed on November 12, 2015 by Debtor as the Employer/Agent.  (Tr. Ex. 12, JM Dep. 1-20-20 Tr. Ex. 73), pp. 39 (ll. 16-24), 40 (ll. 1-24). 41 (ll. 1-24) and 42 (ll. 1-21), admitted by 9/29/23 Order)

71.     The Bank's citations proceedings were stayed during the pendency of the Prior Bankruptcy as they related only to John McMahan. ((Tr. Ex. 24), admitted by 9/29/23 Order).

72.     After the Prior Bankruptcy was dismissed, the McMahan Citations were removed from the Bankruptcy Stay Calendar.  (Tr. Ex. 34).

73.     After dismissal of the Prior Bankruptcy and the removal from the Bankruptcy Stay Calendar, the Bank continued with enforcement of the Judgment and continued with the Citation Proceedings. (Ans., Dkt. 31, ¶ 35)( admitted by 9/29/23 Order).

74.     On April 1, 2017, McMahan-Clemis completed the Interrogatories/Answers to Wage Deduction Proceedings and Calculation to Determine Amount of Withholding, which had a signed Respondent Certification, which was signed on April 1, 2017 by Debtor as the Employer/Agent.  (Tr. Ex. 18, JM Dep. 1-20-20 (Tr. Ex. 73), pp. 46 (ll. 11-24) and 47 (ll. 1-11), admitted by 9/29/23 Order).

75.     In response to the Alias McMahan Citation, an Income and Assets Form was completed and served on the Bank, dated April 4, 2017 with a Verification by Certification signed by Debtor.  (Tr. Ex. 37, JM Dep. 1-20-20 (Tr. Ex. 73), pp. 28 (ll. 15-24) and 29 (ll. 1-15)).

76.     On May 3, 2017, the Cook County Circuit Court entered a Wage Deduction Order/Turnover Order in favor of the Bank and against McMahan-Clemis relating to the non-exempt gross wages of the Debtor.  (Tr. Ex. 41, Ans., Dkt. 31, ¶ 36), admitted by 9/29/23 Order).

77.     At some time after May 17, 2017, Debtor's counsel informed Debtor to make payments to the Bank pursuant to the Wage Deduction Order/Turnover Order.  (JM Dep. 12-14-18 (Tr. Ex. 72), pp. 143 (ll. 11-24) and 144 (ll. 1-8)).

78.     Debtor was informed by his attorney, Neil Brown, to make monthly payments to the Bank pursuant to the Wage Deduction Order/Turnover Order in the amount of $4,800.00 per month which he did on 3-4 occasions.  (JM Dep. 12-14-18 (Tr. Ex. 72), pp. 191 (ll. 9-24)192 (ll. 1-21).

79.     Debtor, as president of McMahan-Clemis, only made 4 payments pursuant to the Wage Deduction Order/Turnover Order with Debtor making the payments himself.  (JM Dep. 12-14-18 (Tr. Ex. 72), pp. 144 (ll. 5-22), 191 (ll. 9-24) and 192 (ll. 1-4) (Tr. Ex. 64, pp. LFB&T 695, 698, 718, 721, 758, 762, 778 and 783).

80.     At all times relevant before the filing of the Chapter 7 Bankruptcy, the Citations and Wage Deduction Order/Turnover Orders filed and served on the Citation Respondents by the Bank, and entered by the Court and served on the Debtor were still in effect. (Tr. Exs. 19-21, 23-26, 28-31, 35, 38, 40, 42-44, 45, 48-55, 57, 59-62), admitted by 9/29/23 Order).

81.     At various times, the Circuit Court of Cook County entered Orders whereby the Citation Proceedings, including the McMahan Citation and the McMahan-Clemis Citation, were entered and continued generally. (Tr. Exs. 19-21, 23-26, 28-31, 35, 38, 40, 42-44, 45, 48-55, 57, 59-62), admitted by 9/29/23 Order).

82.     The Citation Proceedings continued throughout the one year prior to this bankruptcy. (Tr. Exs. 19-21, 23-26, 28-31, 35, 38, 40, 42-44, 45, 48-55, 57, 59-62), admitted by 9/29/23 Order).

83.     As early as July 12, 2017, the Court entered Orders requiring Debtor to show cause why he should not be held in contempt of Court related to his various failures to respond to the Citations, requiring Debtor to present himself before the Court, and holding him in contempt of court, as well as issuing a Body Attachment Order. (Tr. Exs. 22-23, 44 and 59), admitted by 9/29/23 Order).

84.     Debtor appeared in front of Judge White in the State Court Citation Proceedings on several occasions.  (JM Dep. 12-14-18 (Tr. Ex. 72), pp. 208 (ll. 6-24) and 209 (ll. 1-10)).

85.     Debtor was aware that he was appearing in front of Judge White in relation to the Citation Proceedings against him, individually and against McMahan-Clemis.  (JM Dep. 1-20-20 (Tr. Ex. 73), p. 78, ll. 9-13).

86.     Debtor knew he was in State Court before Judge White in relation to the Bank's collection action through the various Citation Proceedings. (JM Dep. 12-14-18 (Tr. Ex. 72), pp. 210 (ll. 15-24) and 211 (l. 1)).

87.     Debtor produced no evidence, and there was no evidence presented to the Court, that prior to his filing his Chapter 7 Bankruptcy the Debtor ever sought relief from the State Court to declare certain income or assets exempt from the Citation Proceedings or that any Order was entered by the State Court to that effect.

88.     Debtor produced no evidence, and there was no evidence presented to the Court, that prior to his filing Chapter 7 Bankruptcy the Debtor, on his own behalf or on behalf of McMahan-Clemis, ever sought relief or authority from the Illinois Circuit Court for Cook County to make any transfers of money by and between the McMahan-Clemis Account 0681, the McMahan Account 1973, and the Trinity Development Account 8807, or to make any transfers to Debtor's wife, Lynn McMahan.

## IV.     Transfer of Money and Payments Made into and out of the Relevant Bank Accounts in the Year Prior to the Filing of Chapter 7 Bankruptcy.

89.     Beginning at least as early as April 2016, the Debtor, as President of McMahan-Clemis and in his individual capacity and as the sole individual with the authority to make such electronic transfers, transferred money electronically by and between the McMahan-Clemis Account 0681, the McMahan Account 1973 and the Trinity Development Account 8807. (Tr. Ex. 63-65, 70) (JM Dep.

11-1-17 (Tr. Ex. 71), p. 71, ll. 3-6) (JM Dep. 1-20-20 (Tr. Ex. 73), pp. 101 (ll. 15-17), 106 (ll. 6-24), 107 (ll. 1-9), 125 (ll. 1-9), 131 (ll. 23-24), 132 (ll. 1-6), 135 (ll. 14-24), 136 (ll. 1-5), 144 (ll. 11-24), 145 (ll. 1-24) and 146 (ll. 1-6).

90.     The transfers made by Debtor, as President of McMahan-Clemis or in his individual capacity, by and between the McMahan-Clemis Account 0681, the McMahan Account 1973 and the Trinity Development Account 8807, were done by Debtor in furtherance of his scheme to avoid the transfer prohibition of the various Citations and the Wage Deduction Order entered against McMahan-Clemis.

91.     In the year prior to filing his Chapter 7 Bankruptcy, between May 15, 2017 to May 14, 2018, the Debtor, as President of McMahan-Clemis and in his individual capacity, transferred money electronically by and between the McMahan-Clemis Account 0681, the McMahan Account 1973 and the Trinity Development Account 8807. (Ans., Dkt. 31, ¶ 56) (Tr. Ex. 63-65, 72) admitted by 9/29/23 Order).

92.     During the time period June 1, 2017 to May 14, 2018, the Debtor caused money to be electronically transferred from the McMahan Account 1973 to the Trinity Development Account 8807. (Ans., Dkt. 31, ¶ 57) (Tr. Ex. 63, 65, 72), admitted by 9/29/23 Order).

93.     During the time period June 2017 to May 2018, the Debtor, in his individual capacity, caused transfers to be made to third-parties from the Trinity Development Account 8807. (Ans., Dkt. 31, ¶ 58) (Tr. Ex. 65), admitted by 9/29/23 Order).

94.     In the year prior to his filing his Chapter 7 Bankruptcy, the Debtor had primary and sole control over the McMahan Account 1973, including sole control over the transfers of money electronically on-line. (Ans., Dkt. 31, ¶ 59) (Tr. Ex. 63), admitted by 9/29/23 Order).

95.     During the time period at issue, May 15, 2017 to May 14, 2018, the Debtor received money via on-line transfers from the McMahan-Clemis Account 0681 to the McMahan Account 1973. (Ans., Dkt. 31, ¶ 60) (JM Dep., 11-1-2017(Tr. Ex. 71), pp. 70 (ll. 1-24), 71, (ll. 3-6), 72 (ll. 1-24), and 73 (ll. 1-12) (Tr. Ex. 63-64, 70), admitted by 9/29/23 Order).

96.     During the time period May 2017 to April 2018, the Debtor, in his individual capacity, caused transfers of money to third parties from the McMahan Account 1973 on or for the Debtor's behalf. (Ans., Dkt. 31, ¶ 62)(JM Dep. 1-20-20 (Tr. Ex. 73), pp. 106 (ll. 6-24) and 107 (ll. 1-6) (Tr. Ex. 63).

97.     During the pendency of, and in violation of, the McMahan-Clemis Citation, the Debtor, as President of McMahan-Clemis made distributions and/or transfers of money to the Debtor, the frequency and amount of which were determined at the Debtor's full and sole discretion. (Ans., Dkt. 31, ¶ 63) (JM Dep. 11-1-17 (Tr. Ex. 71), pp. 70 (ll. 1-24), 71 (ll. 1-24), 72 (ll. 1-24) and 73 (ll. 1-12)), admitted by 9/29/23 Order).

98.     During the time period May 15, 2017 to May 14, 2018, the Debtor, as President of McMahan-Clemis, and the only person with a check card associated with the McMahan-Clemis Account 0681, used the check card for purchases and cash withdrawals to pay McMahan's third-party creditors and for personal, non-exempt purposes and for Debtor's own benefit in an amount in excess

of **$29,849.40**. (Tr. Ex. 63, pp. LFB&T 654-666, 675, 693, 714-716, 738, 756, 796-797, 817-818, 837-838, 856-858, 875-877, and 894-895).

99.     During the time period May 15, 2017 to May 14, 2018, and during the pendency of, and in violation of, the McMahan Citation and the McMahan-Clemis Citation and McMahan-Clemis Wage Deduction Order/Turnover Order, the Debtor, as President of McMahan-Clemis and with sole authority to sign checks, use the check card and transfer money on-line, caused **$41,750.00** to be transferred electronically from the McMahan-Clemis Account 0681 to Trinity Development, including to the Trinity Development Account 8807. (Tr. Ex. 63, LFB&T 653-654, 672, 674, 692, 711-712, 734, 754-755, 773, 794-795), (Tr. Ex. 65, LFB&T 1010, 1018, 1034, 1048, 1056 and 1064)).

100.     Despite being under a Wage Deduction Order Turnover Order from May3, 2017 to his filing of Chapter 7 Bankruptcy on May 14, 2018, the Debtor, as President of McMahan-Clemis, caused McMahan-Clemis make only four (4) payments to , totaling **$18,701.68**, on July 16, 2017, August 3, 2017, October 3, 2017, and November 21, 2017. (Tr. Exs. 18 and 41) (Tr. Ex. 64, pp. LFB&T 695, 698, 718, 721, 758, 762, 778 and 783).

101.     During the time period May 15, 2017 to May 14, 2018, and during the pendency of, and in violation of, the McMahan Citation and the McMahan-Clemis Citation and McMahan-Clemis Wage Deduction Order/Turnover Order, the Debtor transferred **$10,000.00** electronically from the McMahan Account 1973 to the McMahan-Clemis Account 0681. (Tr. Ex. 63-64, 70).

102.     During the time period May 15, 2017 to May 14, 2018, and during the pendency of, and in violation of, the McMahan Citation and the McMahan-Clemis Citation and McMahan-Clemis Wage Deduction Order/Turnover Order, the Debtor received money via online transfers from McMahan-Clemis Account 0681 to McMahan Account 1973 in the amount of **$406,550.00**. (Tr. Ex. 63, LFB&T 231, 239, 247, 255, 263, 269, 285, 295, 313, 323, 335)(Tr. Ex. 64, LFB&T 653-654, 672-674, 691-692, 711-712, 733-734, 753-755, 773-775, 793-795, 814-815, 833-834, 854-855, 873-875, 892-893)(Tr. Ex. 70).

103.     During the time period May 2017 to May 14, 2018 and during the pendency of, and in violation of, the McMahan Citation, the Debtor, in his individual capacity, caused transfers of non-exempt property, money, in the amount of **$525,820.87**, to third parties from the McMahan Account 1973 on or for the Debtor's behalf without obtaining a court order. (Tr. Ex. 63, 70).

104.     During the time period May 2017 to May 14, 2018 and during the pendency of, and in violation of, the McMahan Citation, the Debtor, in his individual capacity, caused transfers of non-exempt property, money, in the amount of **$44,500.00**, to his wife, Lynn McMahan from the McMahan Account 1973 without obtaining a court order. (Tr. Ex. 63, LFB&T 234, 250, 264, 316, 328, and 337).

105.     During the time period May 2017 to May 14, 2018, and during the pendency of, and in violation of, the McMahan Citation, the Debtor, in his individual capacity, caused **$73,800.00** to be electronically transferred from the McMahan Account 1973 to the Trinity Development Account 8807. (Tr. Exs. 63, LFB&T 241-242, 250, 257, 264, 271-272, 287-288, 297-298, 315-316, 328, 337-338)(Tr. Ex.65, LFB&T 1010, 1018, 1034, 1048, 1056, 1064, 1072, 1078, 1086, and 1090)(Tr. Ex. 70).

106.    During the time period May 2017 to May 14, 2018, and during the pendency of, and in violation of, the McMahan Citation, the Debtor, in his individual capacity, used the Trinity Development Account 8807 for his own benefit. (Tr. Ex. 65)

107.    During the time period May 2017 to May 14, 2018, and during the pendency of, and in violation of, the McMahan Citation, the Debtor, in his individual capacity, caused transfers of non-exempt property, money, in the amount of **$87,498.86**, to be made to third parties from the Trinity Development Account 8807 on or for the Debtor's behalf. (Tr. Ex .65, 70).

108.    The hearing on the Bank's Motion related to McMahan-Clemis was held on May 15, 2018, at which time Judge White of the Cook County Circuit Court heard oral arguments and made certain findings of fact and conclusions of law.  These included the following:

> That that the Bank issued a Third-Party Citation to Discover Assets to McMahan-Clemis on October 19, 2015 and that Third-Party Citation has been continually in full effect and remains in effect; that the Citation issued to McMahan-Clemis contained a provision barring McMahan-Clemis from making any transfers of non-exempt property or money to McMahan; that in violation of the McMahan-Clemis Citation, McMahan-Clemis transferred $436,886.98 to Judgment Debtor John McMahan; that the transfers violated the restraining provision of the McMahan-Clemis Citation; that McMahan-Clemis violated the McMahan-Clemis Citation and may have violated the Third-Party Wage Citation; that McMahan-Clemis has failed to cooperate and comply with the McMahan-Clemis Citation; that McMahan-Clemis has been found to be contempt and a Judgment has entered against it due to its violation of the McMahan-Clemis Citation; that McMahan-Clemis has taken no steps to ensure the McMahan-Clemis Citation would not be violated; that pursuant to 735 ILCS 5/2-1402(f)(1) this Court has the authority to enter a judgment in favor the Bank and against McMahan-Clemis in the amount of the unpaid portion of the Judgment or the value of the property transferred, whichever is lesser; and that the amount of the value transferred, $436,886.98, is the lesser amount. (Tr. Ex. 60-62).

109.    On May 15, 2018, the Circuit Court for Cook County, based upon its findings of fact and conclusions of law, entered Judgment in favor of the Bank and against McMahan-Clemis in the amount of **$436,886.98**, and held McMahan-Clemis in Contempt of Court.  Judge White found the violations to be willful. (Tr. Ex. 60).

## V.    Trial.

110.    The Bank issued and served a Subpoena on Debtor requiring the Debtor to appear at the trial originally scheduled for September 25, 2023, with such Subpoena being continued by the Court to October 25, 2023.

111.    The trial was originally scheduled to begin on September 25, 2023; however, based on a Motion filed by the Debtor, the Court entered an Order on September 25, 2023, continuing the trial to October 25, 2023.

112.    The Debtor did not appear at trial despite being under a Subpoena issued and served by the Bank and despite the Court's Order dated September 25, 2023.

113.    In addition to the Bank's exhibits that were admitted by the Court pursuant to its September 29, 2023 Order, the Court, on Motion of the Bank, admitted Bank's Exhibits 68 and 69, the deposition transcripts of Lynn McMahan, and on oral motion of the Bank, admitted Bank Exhibits 71, 72 and 73, the deposition transcripts of John McMahan.

114.    The Debtor provided no evidence by testimony or exhibits at trial and provided no defense to the Bank's case at trial.

## The Bank's Proposed Conclusions of Law

### I.    Jurisdiction.

This federal district courts have original and exclusive jurisdiction over all cases brought under Title 11 of the United States Code (the "Bankruptcy Code"), 28 U.S.C. § 1334(a).  The federal district courts also have original but not exclusive jurisdiction of all civil proceedings arising under the Bankruptcy Code or arising in or related to cases brought under Title 11. 28 U.S.C. § 1334(b).  District Courts may refer these cases to the bankruptcy judges for their districts.  28 U.S.C. § 157(a).  Pursuant to and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois, the District Court for the Northern District of Illinois has referred all bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois.  A bankruptcy judge may enter final judgment on any core proceeding under the Bankruptcy Code or arising in a case under Title 11. 28 U.S.C. § 157(b)(1).  A creditor's objection to discharge of a debtor is a core proceeding.  28 U.S.C. § 157(b)(2)(A), (J).  As such, this Court has jurisdiction to hear and determine the Bank's claim as set forth in its First Amended Complaint to Object to Discharge of Debt.  Venue of this proceeding is in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1409(a). The Bank is a creditor with standing to prosecute its First Amended Complaint pursuant to 11 U.S.C. § 101(5), (10)(A) and 727(a).

## II.     Applicable Legal Standards of Discharge.

Discharge in bankruptcy is a privilege, not a right.  *In re Brahos*, 589 B.R. 381, 393 (Bankr. N.D. Ill. 2018).  A discharge in bankruptcy is intended for the "honest but unfortunate debtor."  *Grogan v. Garner,* 498 U.S. 279, 287 (1991).  Where a debtor has been "less than honest," discharge should be denied.  *Village of San Jose v. McWilliams,* 284 F.3d 785, 790 (7ᵗʰ Cir. 2002).

As the denial of discharge is considered a drastic remedy, a creditor objecting to discharge has the burden to prove the elements of its objections.  *Stathopoulos v. Bostrom,* 286 B.R. 352, 359 (Bankr. N.D. Ill. 2002).  The creditor bears the burden of proof by a preponderance of the evidence on the elements of its claim.  *Peterson v. Scott,* 172 F.3d 959, 966-67 (7ᵗʰ Cir. 1999).  However, once the creditor has established that the acts complained of occurred, the burden of production shifts to the debtor to come forward with a "credible explanation of his actions."  *In re Stamat,* 395 B.R. 59-69-70 (Bankr. N.D. Ill. 2008).  While the creditor bears the ultimate burden of proof, a debtor cannot prevail "if after the creditor has made a *prima facie* case [the debtor] is unable to offer credible evidence." *Clean Cut Tree Serv. v. Costello,* 299 B.R. 882, 895 (Bankr. N.D. Ill. 2003).

In this action, Creditor Lake Forest Bank & Trust Company asserts that the Debtor, John McMahan, should be denied a discharge pursuant to §727(a)(2)(A).  The law and the facts supporting denial of discharge are set forth below.

## III.     Debtor's Discharge should be Denied Under 11U.S.C.§ 727(a)(2)(A).

### A.  Applicable Law.

11 U.S.C.§727(a)(2)(A) provides that a debtor's discharge may be denied when the debtor, with intent to hinder, delay or defraud a creditor…has transferred, removed …or concealed, or has permitted to be transferred, removed …or concealed – (A) property of the debtor, within one year before the date of the filing of the petition . . . ." To prevail on a claim brought pursuant to §727(a)(2)(A), the Bank has the burden of proof to establish:

1. An act (i.e, a transfer or concealment of property); and
2. Improper intent (i.e., a subjective intent to hinder, delay or defraud a creditor). 11 U.S.C. § 727(a)(2)(A), *In re Kontrick,* 295 F.3d 724, 736 (7th Cir. 2002)(*see also, Cohen v. Olbur,* 314 B.R. 732, 742 (Bankr. N.D. Ill. 2004)).
3. Both the act and the intent "must have been present during the year before bankruptcy." *Olbur,* 314 B.R. 742.

Because §727(a)(2)(A) is written as a disjunctive statement, "[t]o be denied discharge a debtor's intent need not rise to the level of intending to 'defraud' a creditor, mere intent to 'hinder' or 'delay' a creditor is sufficient." *First State Bank of Bloomington v. Cannell,* 2013 Bankr. LEXIS 2324, *10, 2013 WL 2467787 (Bankr. C.D. Ill. June 7, 2013) aff'd *Cannell v. First State Bank of Bloomington* 2014 U.S. Dist. LEXIS 102291*, 2014 WL 3725929 (C.D. Ill. July 28, 2014)(citing *Smiley v. First Nat'l Bank of Belleville,* 864 F.2d 562, 568-69 (7th Cir. 1989)). Although the Code requires proof of actual intent, intent can be proved either by direct or circumstantial evidence. *See, Kontrick* 295 F.3d at 736-37. As debtors rarely declare their intent to defraud creditors, "[c]ourts must deduce fraudulent intent by examining the totality of facts and circumstances surrounding the transaction in question." *Costello,* 299 B.R. at 895 (Bankr. N.D. Ill. 2003). Circumstantial evidence can include "inferences drawn from a debtor's course of conduct." *Id.* (citing *Thibodeaux v. Oliver,* 819 F.2d 550, 553 (5th Cir. 1987)). Courts have looked at the "badges of fraud" to analyze circumstantial evidence of actual intent, "which, if proven, indicate actual fraud":

(1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry. *Village of San Jose v. McWilliams,* 284 F.3d 785, 791 (7th Cir. 2002)(quoting *Pavy v. Chastant*, 873 F.2d 89, 91(5th Cir. 1989)).

"If the creditor can show one or some of these factors are met, 'this creates a presumption of an intent to defraud establishing plaintiff's *prima facie* case and shifting … the burden to [the debtor-defendant] of demonstrating that he lacked fraudulent intent.'" *Id.* Although a transfer to relative is

not enough alone to find actual fraud, a transfer to a relative along with other circumstances can support a finding of actual fraud. *Costello*, 299 B.R. at 896(citing *Community Bank of Homewood-Flossmor v. Bailey*, 145 B.R. 919, 927 (Bankr. N.D. Ill. 1992). The term "transfer" is defined in the Bankruptcy Code, in relevant part, as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with . . .property … or an interest in property." 11 U.S.C. § 101(54)(D). The Code does not define "hinder" or "delay". "Hinder" has been defined by courts to mean conduct that impedes or obstructs a creditor. *See, e.g., Cannell* at *9 (citing *Crews v. First Colony Life Ins. Co.,* 168 B.R. 773, 779 (Bankr. M.D. Fla. 1994)). "'Delay' generally refers to putting off to future time, or to postpone." *Id. At* *10 (citing Websters New World College Dictionary 381 (4th ed. 2002)). The term "concealment has been defined to include "'preventing discovery, fraudulently transferring or withholding knowledge or information required by law to be made known.'" *Marcus-Rehtmeuer v. Jacobs,* 784 F.3d 430, 443 (7th Cir. 2015) quoting *In re Scott,* 172 F.3d 959, 967 (7th Cir. 1999).

Transfers made in violation of a citation to discover assets under Illinois law support a finding of the debtor's intent to hinder and delay a creditor. *See, e.g., Cannell,* 2013 Bankr. LEXIS at ** 19-20. The supplementary proceeding "may be against the judgment debtor or any third party the judgment creditor believes has property of or is indebted to the judgment debtor." Ill. S. Ct. R. 277. Supplementary proceedings are permitted pursuant to Illinois law and are commenced by the service of a citation issued by the clerk.  735 ILCS 5/2-1402(a).  The supplementary proceeding continues

> "until terminated by motion of the judgment creditor, order of the court, or satisfaction of the judgment, but terminates automatically 6 months from the date of (1) the respondent's first personal appearance pursuant to the citation or (2) the respondent's first personal appearance pursuant to subsequent process issued to enforce the citation, whichever is sooner. The court may, however, grant extensions beyond the 6 months, as justice may require."

"Once the citation [to discover assets] is served on the judgment debtor, a lien is created in favor of the judgment creditor for all personal property that the debtor has or acquires by the time the court issues a disposition . . ." *Marcus-Rehtmeyer* at 439; §5/2-102(m).  When a judgment debtor, or

a third-party, is served with a citation to discover assets containing the prohibition language, all transfers are prohibited. §5/2-1402(f). The safety valve for such debtors is the availability of an expedited hearing to claim income and assets exempt. *Cannell,* 2013 Bankr. LEXIS 2324 (Bankr. C.D. Ill. 2013) ** 19-20; §5/2-1402(l). A judgment creditor does not have a burden of showing that an exemption is inapplicable but the judgment debtor must affirmatively assert an exemption. *In re Marriage of Takata,* 383 Ill. App. 3d 782, 788 (Ill. App. Ct. 2008)(citing *Dowling v. Chicago Options Associates, Inc.,* 365 Ill. App. 3d 341 (Ill. App. Ct. 2006)("a judgment debtor must affirmatively assert an exemption"))(*see also,* 735 ILCS 5/12-1001 Personal Property Exempt). "There is no statutory exception for transfers made in the ordinary course of business." *City of Chicago v. Air Auto Leasing Co.,* 297 Ill. App. 3d 873, 878 (Ill. App. Ct. 1998). Further, "'once [a judgment debtor] deposits [his] wages into a bank account…the funds become fair game for creditors'" and are covered by the citation to discover assets. *In re Jokiel,* 2012 Bankr. LEXIS 109, * 9 (Bankr. N.D. Ill. 2012)(quoting *In re Koeneman,* 410 B.R. 820, 827 (Bankr. C.D. Ill. 2009)).

**B. The Evidence Presented by the Bank Warrants Denial of Discharge Under §727(a)(2)(A).**

On February 24, 2016, the Debtor filed a Voluntary Petition under Chapter 11, Case No. 16-06137 (the "Prior Bankruptcy"). (FOF, ¶1)[2]. The Prior Bankruptcy was dismissed on November 2, 2016 upon the U.S. Trustee's Motion to Dismiss or Convert. (FOF, ¶2). On or about May 14, 2018, the Debtor filed his Chapter 7 Voluntary Petition in Bankruptcy, in the United States Bankruptcy Court for the Northern District of Illinois, Case No. 18-14064 ("Chapter 7 Bankruptcy"). (FOF, ¶3).

On July 20, 2018, Lake Forest Bank & Trust Company, as a creditor of Debtor, filed its Complaint to Object to Discharge of Debt Pursuant to 11 U.S.C. § 727(a)(2)(A). On February 13, 2019, the Bank filed its First Amended Complaint to Object to Discharge of Debt Pursuant to 11

---

[2] "FOF" refers to the Bank's Proposed Findings of Fact, which contain specific citations to pleadings and evidence that support the statement.

U.S.C. § 727(a)(2)(A). On March 26, 2019, the Debtor filed his Answer to First Amended Complaint
to Object to Discharge of Debt. (Dkt. 31, admitted by 9/29/23 Order). This Court has jurisdiction
over this proceeding pursuant to 28 U.S.C. § 1334. Venue is proper here pursuant to 28 U.S.C. §
1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). The statutory basis for
this Amended Complaint is 11 U.S.C. § 727. (FOF, ¶¶ 4-8).

In the year prior to his filing his Chapter 7 Bankruptcy (May 14, 2017 – May 14, 2018), the
Debtor used a scheme involving three (3) bank accounts he had sole control over to conceal and/or
transfer in excess of $525,000.00. The concealment and transfers were all done in violation of Citation
Proceedings that had been instituted following the entry of a Judgment by the Circuit Court for the
County of Cook on September 30, 2015, in favor of the Bank and against the Debtor and a company
owned and operated by the Debtor, Northwestern Nasal and Sinus Associates, S.C. ("Northwestern
Nasal") in the amount of $1,546,015.56 (the "Judgment"). Debtor's actions constitute his intent "to
hinder, delay or defraud a creditor," specifically the Bank, in violation of 11 U.S.C. §727(a)(2)(A).

1. **Debtor's violation of the Illinois Supplementary Proceedings, 735 ILCS 5/1402,
   proves Intent to Hinder or Delay.**

The Debtor, John McMahan, is an educated individual and a sophisticated businessperson. He
is a doctor of Otolaryngology who practices in the Chicago area, having graduated from the University
of South Carolina Medical School. (FOF, ¶ ¶ 13-14). The Debtor completed his residency in
Otolaryngology at Northwestern University in 1977 and completed his fellowship in head and neck
oncology at Northwestern University in 1978. (FOF, ¶ 15). At the time of his filing his Chapter 7
Bankruptcy, the Debtor was a clinical professor at Northwestern University Medical School. (FOF,
¶ 16). Prior to September 2014, Debtor was the sole shareholder and President of Northwestern Nasal
and Sinus Associates, S.C. a/k/a John T. McMahan, M.D., S.C. ("Northwestern Nasal"). (FOF, ¶ 17).
On or about September 1, 2014, Debtor ceased operations of Northwestern Nasal and became the
sole shareholder and President of McMahan-Clemis Institute of Otolaryngology, S.C. ("McMahan-

Clemis"). (FOF, ¶19). From on or about September 1, 2014 to the Debtor's filing of his Chapter 7 Bankruptcy, Debtor remained the sole shareholder and only officer, President, of McMahan-Clemis. (FOF, ¶ 20).

On September 30, 2015, the Bank obtained a judgment (the "Judgment") against the Debtor and Northwestern Nasal in the aggregate amount of $1,546,015.56 in the Circuit Court of Cook County, Illinois in the case captioned *Lake Forest Bank and Trust Company vs Northwestern Nasal and Sinus Associates, S.C. a/k/a John T. McMahan, M.D., S.C. and Dr. John T. McMahan*, case No 2014 CH 14584 (the "Lawsuit"). The Judgment was awarded after a contested bench trial. (FOF, ¶ 10). After the Judgment was entered against Debtor in September 2015, Debtor was aware that the Bank would attempt to collect the Judgment against him personally. (FOF, ¶ 58). Following entry of the Judgment, the Bank caused several Citations and Third-Party Citations to Discover Assets to be issued to, among others, the Debtor and companies believed to be owned and/or controlled by Debtor and a Citation to Discover Assets to Third Party (Wages) for McMahan-Clemis (the "Citation Proceedings"). (FOF, ¶ 59). Debtor retained the law firm of Cohen Raizes & Regal after the Judgment was entered against him in September 2015 to represent him and McMahan-Clemis in the Citation Proceedings filed against them. (FOF, ¶ 60). On October 9, 2015, the Bank issued a Citation to Discover Assets to the Debtor, and on November 10, 2015, the Bank issued an Alias Citation to Discover Assets to the Debtor (the "Alias McMahan Citation"). (FOF, ¶ 61). On October 19, 2015, the Bank issued a Third-Party Citation to Discover Assets to McMahan-Clemis (the "McMahan-Clemis Citation"), which was served on McMahan-Clemis on October 26, 2015. (FOF, ¶¶ 64-65) On October 19, 2015, the Bank issued a Citation to Discover Assets to Third Party (Wages) for McMahan-Clemis related to the wages of the Debtor (the "McMahan-Clemis Wage Citation"), which was served on October 26, 2015. (FOF, ¶¶ 66-67).

The Alias McMahan Citation (similar to the McMahan-Clemis Citations) contained the following provision:

> **YOU ARE PROHIBITED** from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to the judgment debtor or to which the judgment debtor may be entitled or which may be acquired by or become due to the judgment debtor and from paying over or otherwise disposing of any money not so exempt, which is due or becomes due to the judgment debtor, until further order of court or termination of the proceedings. You are not required to withhold the payment of any money beyond double the amount of the judgment.  (FOF, ¶¶ 62 and 68).

At all times relevant before the filing of the Chapter 7 Bankruptcy, the Citations and Wage Deduction Order/Turnover Orders filed and served on the Citation Respondents by the Bank, and entered by the Court and served on the Debtor were still in effect and continued throughout the one year prior to the Debtor filing his Chapter 7 Bankruptcy (FOF, ¶¶ 80, 82.).  In response to a Citation to Discover Assets to a Third-Party (Wages), McMahan-Clemis filed the completed Interrogatories/Answers to Wage Deduction Proceedings and Calculation to Determine Amount of Withholding, which had a signed Respondent Certification, signed on November 12, 2015 by Debtor as the Employer/Agent.  (FOF, ¶ 70).   On April 1, 2017, McMahan-Clemis completed the Interrogatories/Answers to Wage Deduction Proceedings and Calculation to Determine Amount of Withholding, which had a signed Respondent Certification, which was signed on April 1, 2017 by Debtor as the Employer/Agent.  (FOF, ¶ 74).  In response to the Alias McMahan Citation, an Income and Assets Form was completed and served on the Bank, dated April 4, 2017, with a Verification by Certification signed by Debtor.  (FOF, ¶ 75).  On May 3, 2017, the Cook County Circuit Court entered a Wage Deduction Order/Turnover Order in favor of the Bank and against McMahan-Clemis relating to the non-exempt gross wages of the Debtor.  (FOF, ¶ 76).  At some time after May 17, 2017, Debtor's counsel informed Debtor to make payments to the Bank pursuant to the Wage Deduction Order/Turnover Order in the amount of $4,800.00 per month which he did on only 4 occasions. (FOF, ¶¶ 78-79).

Debtor produced no evidence, and there was no evidence presented to the Court, that prior to his filing his Chapter 7 Bankruptcy the Debtor ever sought relief from the State Court to declare certain income or assets exempt for the Citation Proceedings or that any Order was entered by the State Court to that effect. (FOF, ¶ 87). Debtor produced no evidence, and there was no evidence presented to the Court, that prior to his filing Chapter 7 Bankruptcy the Debtor, on his own behalf or on behalf of McMahan-Clemis, ever sought relief or authority from the Illinois Circuit Court for Cook County to make any transfers of money by and between the McMahan-Clemis Account 0681, the McMahan Account 1973, the Trinity Development Account 8807 or to make any transfers to Debtor's wife, Lynn McMahan. (FOF, ¶ 88)

On or about October 31, 2013, Debtor opened a bank account at Bank of America, an account ending in 8807 (the "Trinity Development Account 8807"), in the name of Trinity Development, II, Inc. ("Trinity Development"), a company in which he was not an officer, director or employee and in which he had no duties or responsibilities and provided no service for. (FOF, ¶¶ 26-27, 42). Rather, Trinity Development was owned and operated by his wife, who was unaware of Trinity Account 8807 being opened and for which she did not give Debtor authority to open or authorize Debtor to make payments on behalf of Trinity Development. (FOF, ¶¶ 23-24, 44-45, 48). When Debtor opened the Trinity Development Account 8807, Debtor used the business address for McMahan-Clemis as the business address for Trinity Development. (FOF, ¶ 43). At all times prior to the filing of the Chapter 7 Bankruptcy, Debtor had sole control over the flow of funds in and out of the Trinity Development Account 8807 and had the only check card for the account. (FOF, ¶¶ 46, 51). During all times prior to the Debtor filing his Chapter 7 Bankruptcy, the Debtor had signatory authority to the Trinity Development Account 8807. (FOF, ¶ 47). During all times prior to the filing of his Chapter 7 Bankruptcy, only the Debtor could make payments out of, transfer money from or make withdrawals from Trinity Development Account 8807. (FOF, ¶ 53).

On or about September 9, 2014, Debtor, in his capacity as President of McMahan-Clemis, opened a bank account at Bank of America, an account ending in 0681, in the name of McMahan-Clemis Institute of Otolaryngology, S.C. (the "McMahan-Clemis Account 0681"), which was the bank account used primarily by McMahan-Clemis.  (FOF, ¶¶ 34-35).  During all times prior to the Debtor filing his Chapter 7 Bankruptcy, only the Debtor had signatory authority to the McMahan-Clemis Account 0681, and only the Debtor had a check card for the account, the authority to withdraw cash from or wire or transfer money from the McMahan-Clemis Account 0681 to any other bank account. (FOF, ¶¶ 36-38).

On or about March 17, 2016, the Debtor opened a personal account in his name with Bank of America, an account ending in 1973, which was the only personal bank account Debtor had during the relevant time period, and which account was still open as of the date of the Debtor's filing of his Chapter 7 Bankruptcy.  (FOF, ¶¶ 55 and 56).   The Debtor had sole control over the flow of funds in an out of the McMahan Account 1973, and was the only individual who could sign checks, transfer or wire money, or use the check card (debit card) associated with the account. (FOF, ¶¶ 57, 94).

In the one year prior to his filing his Chapter 7 Bankruptcy, the Debtor, as President of McMahan-Clemis and in his individual capacity and as the sole individual with the authority to make such electronic transfers, transferred money electronically by and between the McMahan-Clemis Account 0681, the McMahan Account 1973 and the Trinity Development Account 8807.  (FOF, ¶ 89).  In the year prior to filing his Chapter 7 Bankruptcy, between May 15, 2017 to May 14, 2018, the Debtor, as President of McMahan-Clemis and in his individual capacity, transferred money electronically by and between the McMahan-Clemis Account 0681, the McMahan Account 1973 and the Trinity Development Account 8807. (FOF, ¶ 91). During the time period June 1, 2017 to May 14, 2018, the Debtor caused money to be electronically transferred from the McMahan Account 1973 to the Trinity Development Account 8807 (FOF, ¶ 92). During the time period June 2017 to May 2018,

the Debtor, in his individual capacity, caused transfers to be made to third-parties from the Trinity Development Account 8807. (FOF, ¶ 93). During the time period at issue, May 15, 2017 to May 14, 2018, the Debtor received money via on-line transfers from the McMahan-Clemis Account 0681 to the McMahan Account 1973. (FOF, ¶ 95). During the time period May 2017 to April 2018, the Debtor, in his individual capacity, caused transfers of money to third parties from the McMahan Account 1973 on or for the Debtor's behalf. (FOF, ¶ 96). All of these transfers were in violation of the Bank's Citation Proceedings.

During the time period May 2017 to May 14, 2018, and during the pendency of, and in violation of, the McMahan Citation, the Debtor, in his individual capacity, used the Trinity Development Account 8807 for his own benefit. (FOF, ¶ 106). During the pendency of, and in violation of, the McMahan-Clemis Citation, the Debtor, as President of McMahan-Clemis made distributions to the Debtor, the frequency and amount of which were determined at the Debtor's full and sole discretion. (FOF, ¶ 97).

During all times prior to the filing of his Chapter 7 Bankruptcy, only the Debtor could authorize payments or money transfers from either the McMahan-Clemis Account 0681 or the McMahan Account 1973 to Trinity Development Account 8807. (FOF, ¶¶ 40, 49). During all times prior to the Debtor filing his Chapter 7 Bankruptcy, only the Debtor had the authority to transfer money from the McMahan-Clemis Account 0681 into Debtor's personal account, McMahan Account 1973. (FOF, ¶ 39). Any payment made to Debtor, including any distributions or payment of wages other than compensation that resulted in money transfers from McMahan-Clemis Account 0681 into McMahan Account 1973, were made based upon the decision and authorization of Debtor. (FOF, ¶¶ 21, 41).

Between May 15, 2017 and May 14, 2018, the year prior to his filing his Chapter 7 Bankruptcy, during the pendency of, and in violation of, the McMahan Citation and the McMahan-Clemis Citation

and McMahan-Clemis Wage Deduction Order/Turnover Order, and without first obtaining a Court

Order, the Debtor, in his individual capacity or in his capacity as President of McMahan-Clemis made

the following transfers of property:

- as President of McMahan-Clemis, and with only check card associated with the McMahan-Clemis Account 0681, used the check card for purchases and cash withdrawals to pay McMahan's third-party creditors and for personal, non-exempt purposes and for Debtor's own benefit in an amount in excess of **$29,849.40** (FOF, ¶ 98)
- as President of McMahan-Clemis and with sole authority to sign checks, use the check card and transfer money on-line, caused **$41,750.00** to be transferred electronically from the McMahan-Clemis Account 0681 to Trinity Development, including to the Trinity Development Account 8807 (FOF, ¶ 99)
- the Debtor transferred **$10,000.00** electronically from the McMahan Account 1973 to the McMahan-Clemis Account 0681(FOF, ¶ 101)
- the Debtor received money via online transfers from McMahan-Clemis Account 0681 to McMahan Account 1973 in the amount of **$406,550.00** (FOF, ¶ 102)
- the Debtor, in his individual capacity, caused transfers of non-exempt property, money in the amount of **$525,820.87**, to third parties from the McMahan Account 1973 on or for the Debtor's behalf (FOF, ¶ 103)
- the Debtor, in his individual capacity, caused transfers of non-exempt property, money, in the amount of **$44,500.00**, to his wife, Lynn McMahan from the McMahan Account 1973 (FOF, ¶ 104)
- the Debtor, in his individual capacity, caused **$73,800.00** to be electronically transferred from the McMahan Account 1973 to the Trinity Development Account 8807 (FOF, ¶ 105)
- the Debtor, in his individual capacity, caused transfers of non-exempt property, money, in the amount of **$87,498.86**, to be made to third parties from the Trinity Development Account 8807 on or for the Debtor's behalf (FOF, ¶ 107)

As a result of the violation of the McMahan-Clemis Citation through the transfers of money

from the McMahan-Clemis Account 0681 to the McMahan Account 1973 and the Trinity Account

8807, all of which were done by the Debtor for the Debtor's benefit, Judge White of the Cook County

Circuit Court found McMahan-Clemis to be in contempt of court. Judge White found "that the

transfers violated the restraining provision of the McMahan-Clemis Citation; that McMahan-Clemis

violated the McMahan-Clemis Citation and may have violated the Third-Party Wage Citation . . . ."

(FOF, ¶ 108).

Supplementary proceedings are permitted pursuant to Illinois law and are commenced by the service of a citation issued by the clerk. 735 ILCS 5/2-1402(a). "Once the citation [to discover assets] is served on the judgment debtor, a lien is created in favor of the judgment creditor for all personal property that the debtor has or acquires by the time the court issues a disposition . . ." *Marcus-Rehtmeyer* at 439; §5/2-102(m). When a judgment debtor, or a third-party, is served with a citation to discover assets containing the prohibition language, all transfers are prohibited. §5/2-1402(f). The safety valve for such debtors is the availability of an expedited hearing to claim income and assets exempt. *Cannell,* 2013 Bankr. LEXIS 2324 (Bankr. C.D. Ill. 2013) ** 19-20; §5/2-1402(l). A judgment creditor does not have a burden of showing that an exemption is inapplicable but the judgment debtor must affirmatively assert an exemption. *In re Marriage of Takata,* 383 Ill. App. 3d 782, 788 (Ill. App. Ct. 2008)(citing *Dowling v. Chicago Options Associates, Inc.,* 365 Ill. App. 3d 341 (Ill. App. Ct. 2006)("a judgment debtor must affirmatively assert an exemption"))(*see also,* 735 ILCS 5/12-1001 Personal Property Exempt). "There is no statutory exception for transfers made in the ordinary course of business." *City of Chicago v. Air Auto Leasing Co.,* 297 Ill. App. 3d 873, 878 (Ill. App. Ct. 1998). Further, "'once [a judgment debtor] deposits [his] wages into a bank account…the funds become fair game for creditors'" and are covered by the citation to discover assets. *In re Jokiel,* 2012 Bankr. LEXIS 109, * 9 (Bankr. N.D. Ill. 2012)(quoting *In re Koeneman,* 410 B.R. 820, 827 (Bankr. C.D. Ill. 2009)).

Transfers made in violation of a citation to discover assets under Illinois law support a finding of the debtor's intent to hinder and delay a creditor. *See, e.g., Cannell,* 2013 Bankr. LEXIS at ** 19-20. The supplementary proceeding "may be against the judgment debtor or any third party the judgment creditor believes has property of or is indebted to the judgment debtor." Ill. S. Ct. R. 277. Here, all of the transfers at issue occurred in the one year prior to the Debtor filing his Chapter 7 Bankruptcy (May 15, 2017 to May 14, 2018) and violated the Citation Proceedings including: (1) transfers or cash withdrawals/check card use from McMahan-Clemis Account 0681 totaling over $478,000 ($29,849 in

check cards/cash, $41,750 in transfers to Trinity Development Account 8807, and $406,550 in transfers to McMahan Account 1973); (2) transfers or cash withdrawals/check card use from McMahan Account 1973 totaling over $525,000 (including $10,000 in transfers to McMahan-Clemis Account 0681, $73,000 in transfers to Trinity Development Account 8807 and $44,500 in transfers to his wife Lynn McMahan), and (3) transfers or payments made in the amount of $84,498.86 to various third parties. These transactions, at a minimum, "hindered" the Bank in its collection efforts and "delayed" the Bank's ability to collect on the Judgment. These transactions, all of which violated the Citation Proceedings, support a finding that Debtor made the transfers within one year before the date of his filing of his Chapter 7 Bankruptcy Petition with the intent to hinder or delay a creditor, the Bank.

2. **Debtor's Transfers of Money from the Various Bank Accounts Prove Intent to Defraud**.

As set forth above, while the Code requires proof of actual intent, intent can be proved either by direct or circumstantial evidence. *See, Kontrick* 295 F.3d at 736-37. "Courts must deduce fraudulent intent by examining the totality of facts and circumstances surrounding the transaction in question." *Costello,* 299 B.R. at 895 (Bankr. N.D. Ill. 2003). Circumstantial evidence can include "inferences drawn from a debtor's course of conduct." *Id.* (citing *Thibodeaux v. Oliver,* 819 F.2d 550, 553 (5th Cir. 1987). Here, the Debtor's course of conduct alone proves his intent to defraud. The Debtor set up three separate Bank accounts that he had sole authority over, the McMahan-Clemis-Account 0681, the McMahan Account 1973 and the Trinity Development Account 8807. During the one year before filing his Chapter 7 Bankruptcy Petition, the Debtor, in his capacity as the President and only shareholder of McMahan-Clemis, caused transfers of property, money, from the McMahan-Clemis Account 0681 into the McMahan Account 1973 and the Trinity Development Account 8807. Debtor, in his individual capacity, then used the McMahan Account 1973 and the Trinity Development Account 8807 to make payments to his wife and various third parties all without the knowledge of the

Bank and with the Debtor's knowledge that he was subject to a judgment and Citation Liens in favor of the Bank.

In addition, however, courts have looked at the "badges of fraud" to analyze circumstantial evidence of actual intent, "which, if proven, indicate actual fraud":

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry. *Village of San Jose v. McWilliams,* 284 F.3d 785, 791 (7th Cir. 2002)(quoting *Pavy v. Chastant*, 873 F.2d 89, 91(5th Cir. 1989)).

"If the creditor can show one or some of these factors are met, 'this creates a presumption of an intent to defraud establishing plaintiff's *prima facie* case and shifting … the burden to [the debtor-defendant] of demonstrating that he lacked fraudulent intent.'" *Id.* Although a transfer to relative is not enough alone to find actual fraud, a transfer to a relative along with other circumstances can support a finding of actual fraud. *Costello*, 299 B.R. at 896(citing *Community Bank of Homewood-Flossmor v. Bailey,* 145 B.R. 919, 927 (Bankr. N.D. Ill. 1992).

Here, there was no consideration given for the transfers from McMahan-Clemis Account 0681 to either the McMahan Account 1973 or the Trinity Development Account 8807.  Rather, McMahan, as President of McMahan-Clemis made the transfers "whenever he needed the money."  (FOF, ¶ 21). And as there was no relationship between McMahan-Clemis and Trinity Development (FOF, ¶ 28), there could be no consideration for the transfers to the Trinity Development Account 8807. McMahan made transfers in the amount of $44,500 directly to his wife, Lynn McMahan.  The transfers he made from McMahan-Clemis 0681 to McMahan 1973 and Trinity Development 8807 were made by Debtor, in his capacity as President, to the Debtor in his individual capacity.  In effect, Debtor made it from himself to himself, thus retaining the benefit and use of the property.  Once the scheme

was uncovered and the State Court entered a contempt of Court Order and judgment against McMahan-Clemis, thus stopping the indiscriminate and violative transfers, the Debtor almost immediately filed his Chapter 7 Bankruptcy. Finally, the general chronology of events and transactions and the cumulative effect of the pattern of transactions and course of conduct after the entry of the State Court Judgment and the institution of the Citation Proceedings by the Bank weigh in favor of a finding of fraudulent intent. The Bank has established most, if not all, the badges of fraud, shifting the burden to Debtor to demonstrate that he lacked fraudulent intent. The Debtor failed to demonstrate that he lacked individual fraudulent intent.

**WHEREFORE,** Lake Forest Bank & Trust Company, as Plaintiff in the adversary proceeding, requests the Court to enter a Judgment in its favor and against Debtor/Defendant John T. McMahan and enter an order denying Debtor a discharge pursuant to 11 U.S.C. § 727(a)(2)(A), and grant such further, or other, relief, this Court finds the Bank entitled.

**LAKE FOREST BANK & TRUST COMPANY**

By: /s/ C. Douglas Moran
            One of its Attorneys

Kurt M. Carlson ARDC #6236568
C. Douglas Moran ARDC #6310780
CARLSON DASH, LLC
216 S. Jefferson St., Suite 303
Chicago, IL 60661
Telephone: (312) 382-1600
Email: kcarlson@carlsondash.com
Email: cdmoran@carlsondash.com

## <u>CERTIFICATE OF SERVICE</u>

Under penalty of perjury, I, Kaitlyn Noonan, the undersigned non-attorney, hereby certify that I served the foregoing document by (i) first-class mail, by placing a copy of same in a postage prepaid envelope and depositing same in the U.S. Mail, and (ii) by email delivery, on **November 15, 2023**, addressed as follows:

John T. McMahan
52 Aintree Road
Saint Charles, IL 60174
Email: goldcoastpro@gmail.com

/s/ Kaitlyn Noonan