**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 18 B 14064 |
| | ) | |
| JOHN T. McMAHAN, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Honorable Janet S. Baer |
| | ) | |
| | ) | |
| LAKE FOREST BANK & TRUST | ) | |
| COMPANY, | ) | Adversary No. 18 A 00252 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN T. McMAHAN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION**

This matter is before the Court on the first amended complaint filed by Lake Forest Bank & Trust Company (the "Bank") against John T. McMahan (the "Debtor"), seeking denial of the Debtor's discharge under 11 U.S.C. § 727(a)(2)(A).[1] Based on the evidence presented and a review of all relevant documents, exhibits, arguments, and case law, and for the reasons set forth below, the Court finds in favor of the Bank and against the Debtor. Accordingly, the Debtor's discharge will be denied.

**JURISDICTION**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Internal

---

[1] Unless otherwise noted, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101 to 1532.

Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

## INTRODUCTION

On May 14, 2018, the Debtor filed a petition for relief under chapter 7 of the Bankruptcy Code.[2] (Bankr. No. 18 B 14064, Dkt. 1.) About two months later, on July 20, 2018, the Bank filed an adversary complaint in the bankruptcy case, objecting to the Debtor's discharge pursuant to section 727(a)(2)(A). (Dkt. 1.[3]) Thereafter, on February 13, 2019, the Bank filed its first amended complaint (Dkt. 27) (the "Complaint"). The Debtor filed an answer to the Complaint on March 26, 2019. (Dkt. 31.)

The Bank is a creditor of the Debtor by virtue of a judgment (the "Judgment") which it obtained on September 30, 2015 against the Debtor, among others, in the aggregate amount of $1,546,015.56 in the Circuit Court of Cook County, Illinois (the "state court") in the case captioned *Lake Forest Bank & Trust Company v. Northwestern Nasal and Sinus Associates, S.C. a/k/a John T. McMahan, M.D., S.C. and Dr. John T. McMahan*, Case No. 2014 CH 14584 (the "Lawsuit"). (Dkt. 31 ¶ 16.) The Judgment was awarded after a contested bench trial. (*Id.*; Tr. Ex. 3 and 4.[4])

In its Complaint, the Bank alleges that in the year prior to the filing of his chapter 7 case, the Debtor engaged in a scheme involving three bank accounts over which he had sole control to

---

[2] The Debtor previously filed a chapter 11 bankruptcy case on February 24, 2016. (Bankr. No. 16 B 06137, Dkt. 1.) That case was dismissed on November 2, 2016 on the United States Trustee's motion. (*Id.*, Dkt. 92.) The Debtor's business, McMahan-Clemis Institute of Otolaryngology S.C., subsequently filed a chapter 11 case, on June 20, 2018. (Bankr. No. 18 B 17563, Dkt. 1.) A chapter 11 plan was confirmed in that case on June 19, 2019. (*Id.*, Dkt. 224.) Due to the debtor's default under the plan, however, the plan was not substantially consummated, a final decree was never entered, and the case was dismissed.

[3] Unless otherwise noted, all docket references are to the docket in this adversary proceeding (Adv. No. 18 A 00252).

[4] Citations to "Tr. Ex. ___" refer to the Bank's trial exhibits which were admitted into evidence pursuant to an order entered on September 29, 2023 (Dkt. 101) or by the Court at the trial of this matter on October 25, 2023.

transfer and/or conceal more than $500,000. According to the Bank, the transfers and concealment were done in violation of citations issued by the Bank following entry of the Judgment against the Debtor and his medical practice. The Bank asserts that the Debtor's actions constitute his intent to hinder, delay, or defraud his creditors—specifically the Bank—in violation of section 727(a)(2)(A) and that, thus, the Debtor should be denied a discharge in his bankruptcy case.

**PRETRIAL PROCEEDINGS AND THE OCTOBER 25, 2023 TRIAL**

The trial on the Bank's adversary Complaint ultimately took place without the Debtor present, effectively making the Court's decision a default judgment. The default did not occur, however, due to a lack of effort on the part of the Court and the Bank to obtain the Debtor's participation. Rather, the Court and the Bank provided the Debtor with every reasonable opportunity to appear, participate, and defend himself. There were no due process violations.

Prior to the Court setting a trial date on the Bank's Complaint, the Debtor, the chapter 7 trustee, and various entities owned or controlled by the Debtor's wife, Lynn McMahan, had engaged in approximately five years of discovery and litigation. At the time that the matter was set for trial, the Debtor was unrepresented, his second personal bankruptcy attorney having been granted permission to withdraw on October 25, 2022. (Dkt. 72.) From the time that the attorney withdrew to the date that the adversary was set for trial, the matter came before the Court for status on eight separate occasions. During the course of those status hearings—and several others in the Debtor's chapter 7 bankruptcy case and various related adversary proceedings involving Lynn McMahan and her business entities—the Court repeatedly advised the Debtor that his discharge was at issue and that it would be in his best interest to retain counsel. The Court also told the Debtor that if he did not retain counsel, he would ultimately have to represent himself at trial. In response, the Debtor said that he understood and that he was hoping to hire an attorney. Despite

3

the Court's many reminders, the Debtor did not retain counsel to represent him in either the adversary proceeding or his chapter 7 bankruptcy case, and he remains unrepresented to this day.

On June 14, 2023, with the Debtor present in the courtroom via Zoom, the Court entered a final pretrial order in the adversary proceeding (Dkt. 81), setting the trial for September 25 and 26, 2023. The order also set dates for the filing of a joint pretrial statement and pretrial briefs, as well as the exchange and delivery of exhibits. (*Id.*) During the hearing, the Court made it clear to the Debtor that the trial was going to go forward and again encouraged him to retain counsel; the Court reiterated that if the Debtor did not have an attorney, he would need to represent himself and prepare his own pretrial materials. The Debtor again indicated that he understood. The final pretrial order was emailed to the Debtor and also sent to him via U.S. mail at his office in Hinsdale, both addresses having been provided to the Court by the Debtor. (Dkt. 83.)

About three months later, on September 8, 2023, counsel for the Bank sent an email message to the Debtor outlining the requirements for preparation of the joint pretrial statement. (Dkt. 95, Ex. 2.) In that message, Bank's counsel indicated that he would be sending the proposed documents to the Debtor on Monday, September 11, 2023 and that, due to the volume of the exhibits, delivery of hard copies by Federal Express likely would be "best," although electronic copies could also be sent via email. (*Id.*) Counsel for the Bank did not receive a response from the Debtor to this message. (*Id.* at 5 ¶ 16.)

Three days later, on September 11, 2023, Bank's counsel sent another email message to the Debtor in which counsel attached a proposed statement of stipulated facts and lists of the Bank's witnesses and trial exhibits, along with a copy of the final pretrial order and the Debtor's answers to the Bank's Complaint for the Debtor's reference. (*Id.*, Ex 3.) Included in the message was a deadline of September 14, 2023 by which Bank's counsel needed a list from the Debtor of

stipulated and disputed facts, as well as any objections that the Debtor had to the Bank's witnesses and exhibits. *(Id.)* Counsel further requested in the email the Debtor's proposed statement of stipulated facts, his own lists of witnesses and exhibits, and his statement of the theory of any defenses that he had. (*Id.*) According to the message, if Bank's counsel did not receive the requested materials by the deadline provided, he would assume that the Debtor was not stipulating to any facts, had no objections to the witnesses and/or exhibits, and would not be submitting a statement of the theory of his defenses, and counsel would then file the joint pretrial statement on September 15, 2023 without the Debtor's input. (*Id.*) Also on September 11, 2023, Bank's counsel's legal assistant emailed to the Debtor a link to all of the Bank's proposed trial exhibits and informed him that hard copies of all of the exhibits would also be sent to him via Federal Express. (*Id.*, Ex. 4.)

It was not until Friday morning, September 15, 2023, that counsel for the Bank received an email from the Debtor in which he acknowledged receipt of both the September 11, 2023 message, which he had "just [then] read," and Federal Express delivery of the documents, which had arrived on September 14, 2023. (*Id.*, Ex. 5 at 2.) In that email, the Debtor, among other things, requested a continuance "in order to prepare to defend [himself] or to retain an attorney." (*Id.*) Bank's counsel responded to the Debtor's message by reminding him of his duties and responsibilities under the final pretrial order, the efforts that the Bank had taken to get the Debtor to participate, the Debtor's failure to respond, and the fact that the Debtor had been advised by the Court on numerous occasions since October 2022 to obtain an attorney. (*Id.*) Bank's counsel also indicated that he would accept anything that the Debtor wanted to include in the joint pretrial statement until 11:00 a.m. that day and that he planned to file the pretrial statement along with the Bank's trial brief by 1:00 p.m., with or without the Debtor's input. (*Id.*)

Later that same morning, the Debtor sent another email message to Bank's counsel, requesting a continuance because he was "not qualified to defend [himself]" and "[had] no idea how to create the documents/pleadings [that the Bank] claim[ed] [were] required." (*Id.*) In response, Bank's counsel stated that the Bank would not agree to a continuance and would be filing the required documents as set forth in the Court's final pretrial order by 1:00 p.m. that day. (*Id.*) The Debtor neither responded to that email nor provided any documents or other statements. (*Id.* at 7 ¶ 26.) At 1:00 p.m that afternoon, pursuant to the Court's final pretrial order, the Bank filed its "joint" pretrial statement. (Dkt. 92.) In that document, counsel for the Bank described the steps that he took to get the Debtor's input and participation with respect to the final pretrial order requirements and outlined the email correspondence that he had had with the Debtor, as discussed above. (*Id.* at 1.) According to the Bank, because the Debtor had provided no objections to the Bank's witness and exhibit lists, no statement stipulating or disputing the Bank's facts for trial, no defense theory of the case, and no proposed witness list, exhibit list, or statement of facts of his own, the Bank was submitting the joint pretrial statement without input from the Debtor. (*Id.*)

On August 30, 2023, the Bank, also in preparation for the trial, caused subpoenas to be issued to the Debtor and Lynn McMahan, among others, requiring them to appear and testify at the trial scheduled for September 25, 2023. (Dkts. 84, 85.) On September 5, 2023, the Bank caused a similar subpoena to be issued on Trinity Development II, Inc. – Attn: Lynn McMahan, President. (Dkt. 91.) The Debtor was served with the subpoena that had been issued to him; however, a certificate of non-service filed with the Court indicated that a process server had unsuccessfully attempted to serve the subpoenas on Lynn McMahan, both individually and as president of Trinity Development II, Inc. ("Trinity Development"), at the home that she shares with the Debtor in St. Charles, Illinois on six different occasions. (Dkt. 103, Ex. 5.) The certificate provided that on three

6

of those occasions, the process server was told by the Debtor that Lynn McMahan was not at home. (*Id.*) On the other three occasions, no one answered the door despite that fact that the process server observed a car in the driveway and/or lights on in the home. (*Id.*)

On September 18, 2023, seven days before commencement of the trial, the Bank filed a motion seeking denial of the Debtor's request for a continuance and entry of a default judgment in favor of the Bank and against the Debtor or, in the alternative, admission of the Bank's trial exhibits and statement of facts, as well as sanctions against the Debtor. (Dkt. 95.) In that motion, Bank's counsel indicated that earlier that day the Debtor had sent counsel an email message, again requesting a continuance of the trial, this time because he was in the emergency room at a hospital in St. Charles "with either Covid or the Rhinovirus," and the "doctors advise[d] that [he] could be quite contagious for up to two weeks"; for those reasons, the Debtor said, he was unable to prepare for the trial. (*Id.* at 5 ¶ 29 & Ex. 6.) According to its motion, the Bank would not agree to any request for a continuance based solely on the Debtor's representations in his email "[b]ecause of the history of these types of tactics . . . used by the Debtor and . . . those related to [him]." (*Id.* ¶ 33.)

In addition to counsel for the Bank, the Debtor had addressed the September 18, 2023 email message to two other attorneys, Robert Shelist (counsel for some of Lynn McMahan's business entities) and John M. O'Toole, neither of whom had filed an appearance on behalf of the Debtor. (*Id.* at 5 ¶ 30 & Ex. 6.) Counsel for the Bank responded to the Debtor's email, requesting information about whether either Mr. Shelist or Mr. O'Toole might be representing the Debtor. (*Id.* at 5–6 ¶ 31 & Ex. 6.) Only Mr. Shelist replied, advising that he did not represent the Debtor in either his bankruptcy case or the adversary. (*Id.*, Ex. 6.)

On September 20, 2023, the Debtor filed an objection to the Bank's motion and requested

7

a continuance of the trial date.[5] (Dkt. 96.) The Debtor was requesting a continuance, he said, due to his illness and "not for any other purposes." (*Id.* at 2 ¶ 11.) Attached to his objection was an "After Visit Summary" from Northwestern Medicine dated September 18, 2023, which indicated that the Debtor had been having "[d]ifficulty [b]reathing" because of "[m]oderate asthma with exacerbation, unspecified whether persistent," and "[v]iral infection." (*Id.* at 5.) The summary went on to explain that the Debtor had "a viral upper respiratory illness ('URI'), which is another term for the common cold" and that the virus was contagious only "during the first few days." (*Id.* at 7.)

The Bank's motion and the Debtor's objection and request for continuance were heard by the Court on September 25, 2023, the date set for the first day of trial. The Debtor did not appear. After considering the parties' documents and positions, the Court continued the trial for one month, to October 25 and 26, 2023, based on the Debtor's medical records; denied the Bank's request for entry of a default judgment; and provided that the subpoena to appear and testify that had been served on the Debtor was continuing and effective as to the continued trial dates. (Dkt. 101.) The Court also granted in part the Bank's motion as to sanctions, due to the Debtor's failure to comply with the Court's final pretrial order, by: (1) allowing the Bank's witness list without objection; (2) admitting into evidence certain of the Bank's exhibits attached to the pretrial statement without objection; (3) admitting certain of the Bank's statements of fact without objection; (4) prohibiting the Debtor from introducing at trial the testimony of any witnesses not appearing on the Bank's witness list; and (5) prohibiting the Debtor from introducing any exhibits of his own. (*Id.*) An order setting forth this relief was entered on September 29, 2023, and a copy was sent to the Debtor at the email address that he had provided to the Court. (*See* Dkt. 102.) According to the order, the

---

[5] Although he claimed that he does not represent the Debtor in any capacity, the docket reflects that Mr. Shelist filed this objection on behalf of the Debtor. His name, however, does not appear anywhere in the document.

8

October trial dates were "final," and "no further continuances [would] be granted." (Dkt. 101.)

On September 26, 2023, the Bank caused another subpoena to be issued to Trinity Green, LLC – Attn: Lynn S. McMahan, President, which required Lynn McMahan to appear and testify at the trial scheduled for October 25, 2023. (Dkt. 100.) A certificate of non-service filed with the Court indicated that a process server had tried to serve the subpoena on Lynn McMahan at the home that she shares with the Debtor in St. Charles, Illinois on five different occasions. (Dkt. 103, Ex. 5.) According to the process server, no one ever answered the door, but on all occasions lights were on inside the home and at least one car was in the driveway. (*Id.*)

On October 19, 2023, the Bank filed a motion for admission of evidence pursuant to Federal Rule of Evidence 804, which was scheduled to be heard on October 25, 2023, the first day of the trial. (Dkt 103.) On the same day, the Bank served the motion on the Debtor, both via first class mail to his home in St. Charles, Illinois and by email. (*Id.* at 2.) Due to its inability to serve Lynn McMahan with the subpoenas, the Bank asked the Court to admit the deposition testimony of Trinity Development, through Lynn McMahan, the transcripts of which were provided in the Bank's Trial Exhibits 68 and 69. (*Id.* at 6–8.)

The Debtor did not appear at the trial on October 25, 2023, despite having been subpoenaed by the Bank and in violation of the Court's order dated September 29, 2023. As a result, the Court proceeded to conduct the trial as scheduled, without the Debtor in attendance, and permitted the Bank to present an offer of proof on its evidence. In addition to the Bank's exhibits that were admitted into evidence pursuant to the order entered on September 29, 2023, the Court admitted the transcripts of Lynn McMahan's deposition testimony contained in the Bank's Trial Exhibits 68 and 69. Also, on an oral motion of Bank's counsel, the Court admitted the Bank's Trial Exhibits 71, 72, and 73, which are transcripts of various deposition testimony of the Debtor.

At the conclusion of Bank's counsel's offer of proof, the Court directed counsel to submit proposed findings of fact and conclusions of law, which were filed on November 15, 2023. (Dkt. 107.) The Court has used those proposed findings and conclusions to help prepare this ruling.

## FACTUAL BACKGROUND

Having explained how the instant adversary proceeding came to tried without the Debtor being present, the Court now turns to the facts in this matter.

### The Parties and Other Participants

The Debtor—the defendant in this adversary—is a doctor of otolaryngology who has practiced in the Chicago area. (Dkt. 31 ¶ 5.) At the time of the filing of his chapter 7 bankruptcy case on May 14, 2018 (the "Petition Date"), the Debtor was also a clinical professor at Northwestern University Medical School. (*Id.* ¶ 7.)

Prior to September 2014, the Debtor was the sole shareholder and president of Northwestern Nasal and Sinus Associates, S.C. a/k/a John T. McMahan, M.D., S.C. ("Northwestern Nasal"). (*Id.* ¶ 9.) On or about September 1, 2014, the Debtor ceased operations of Northwestern Nasal and became the sole shareholder and president of McMahan-Clemis Institute of Otolaryngology, S.C. ("McMahan-Clemis"). (*Id.* ¶ 10.) From September 1, 2014 to May 14, 2018, he remained the only shareholder and officer of the medical practice. (*Id.* ¶ 11; Tr. Ex. 71 at 9:3–20, 11:11–13.[6]) In his capacity as president, the Debtor was solely responsible for deciding if and when McMahan-Clemis would make a distribution to its only shareholder—the Debtor—and he made that determination whenever he needed money. (Tr. Ex. 71 at 59:19–60:5.)

Lynn McMahan is the Debtor's wife. (*Id.* at 7:5–11.) The two have been married since

---

[6] Trial Exhibits 68, 69, and 71–73 are the various transcripts from discovery depositions taken of the Debtor and his wife Lynn McMahan over the course of the Bank's supplemental state court proceedings, the Debtor's bankruptcy case, and this adversary proceeding, and all were admitted as evidence in this matter.

1991. (*Id.*) Lynn McMahan was never an employee of McMahan-Clemis. (Tr. Ex. 72 at 103:15–17.)

Prior to the Petition Date, Trinity Development was an Illinois corporation of which Lynn McMahan was both president and a shareholder. (Tr. Ex. 68 at 11:15–12:9.) The Debtor had little familiarity with Trinity Development before filing his chapter 7 bankruptcy case, had no ownership interest in the company, and was not one of its officers, directors, or employees. (Tr. Ex. 72 at 12:14–13:12.) Nor was the Debtor ever authorized to act as an agent of Trinity Development and performed no services for the corporation. (Tr. Ex. 68 at 27:13–28:22.) In short, the Debtor had no duties or responsibilities in relation to Trinity Development and no involvement whatsoever in its operations.  (Tr. Ex. 72 at 14:7–17.)

Likewise, there is no working relationship between Trinity Development and McMahan-Clemis. (Tr. Ex. 71 at 52:20–22.) However, McMahan-Clemis leased an apartment from Trinity Development for which the former paid the latter monthly rental payments of $4,000 until approximately May 2017. (Tr. Ex. 72 at 103:21–105:5.) McMahan-Clemis typically made the lease payments to Trinity Development by check. (*Id.* at 109:5–16.) Other than these payments, McMahan-Clemis never owed any money to Trinity Development. (*Id.* at 103:18–20.)

Finally, the Bank is a national banking association with its principal place of business in Illinois. (Dkt. 92 at 21 ¶ 9.) On September 15, 2015, a state court Judgment was entered in favor of the Bank and against the Debtor and Northwestern Nasal in the total amount of more than $1.5 million. (Dkt. 31 ¶ 16.) Prior to the Petition Date, the Debtor was aware of the Bank's Judgment against him and his medical practice. (Tr. Ex. 73 at 22:8–23:22.)

**Relevant Bank Account Information**

Three bank accounts are pertinent to the inquiry at issue in this adversary proceeding: one

in the name of Trinity Development (the "Trinity Development Account"), another in the name of McMahan-Clemis (the "McMahan-Clemis Account"), and a third the Debtor's personal account (the "McMahan Account"). All three accounts were opened by the Debtor, all at Bank of America.

Specifically, in October 2013, the Debtor opened an account ending in 8807 at Bank of America in the name of Trinity Development, the company of which Lynn McMahan was president. (Tr. Ex. 65; Tr. Ex. 73 at 210:20–211:7.) In opening that account, the Debtor used the address for McMahan-Clemis as Trinity Development's address. (Tr. Ex. 73 at 131:23–132:20.) The Debtor never had authority from Lynn McMahan or Trinity Development to open a bank account in the company's name. (Tr. Ex. 69 at 172:9–15.) In fact, prior to May 2018, Lynn McMahan was unaware that the Debtor had opened and was making payments out of the Trinity Development Account. (*Id.* at 173:5–174:22.)

At all relevant times before the Petition Date, the Debtor had sole control over the flow of funds into and out of the Trinity Development Account (Tr. Ex. 73 at 134:19–136:5, 211:8–12); was the only person who had a check card for that account[7] (*id.* at 141:4–142:22); had signatory authority on the account[8] (Dkt. 31 ¶ 15); and consistently used the account for a number of years (Tr. Ex. 73 at 133:19–134:11). Only the Debtor was able to authorize payments or money transfers from either the McMahan-Clemis Account or the McMahan Account to the Trinity Development Account (*id.* at 106:6–107:9, 125:1–9), and for the majority of time prior to the Petition Date, the only source of funds going into the Trinity Development Account were transfers from the McMahan-Clemis Account and the McMahan Account (Tr. Ex. 65; Tr. Ex. 73 at 153:5–154:5).

---

[7] "Check cards" are also known as "debit cards." *See, e.g., Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 590 (N.D. Ill. 2011).

[8] When deposed, Lynn McMahan stated that she did not know whether she had signatory authority on the Trinity Development Account. (Tr. Ex. 73 at 212:19–214:4.)

Likewise, only the Debtor could make payments, transfer money, or make withdrawals *from* the Trinity Development Account. (Tr. Ex. 73 at 131:23–132:6, 135:14–136:5.) For her part, Lynn McMahan was unaware of any payments being made on behalf of Trinity Development out of its account and did not authorize the Debtor to make any such payments on behalf of the company from that account. (Tr. Ex. 69 at 174:14–22.)

On or about September 9, 2014, the Debtor, in his capacity as president of McMahan-Clemis, opened an account ending in 0681 at Bank of America in the name of McMahan-Clemis Institute of Otolaryngology, S.C.[9] (Dkt. 31 ¶ 12; Tr. Ex. 64; Tr. Ex. 73 at 108:8–24.) During the relevant time prior to the Petition Date, only the Debtor had: (1) signatory authority on the McMahan-Clemis Account (Dkt. 31 ¶ 13; Tr. Ex. 72 at 110:12– 111:1); (2) a check card for the McMahan-Clemis Account and authority to withdraw cash from that account (Tr. Ex. 73 at 175:11–17, 178:8–24, 188:7–190:7); and (3) the authority to wire or otherwise transfer money from the McMahan-Clemis Account to any other bank account (*Id.* at 101:15–103:1, 106:6–107:6). Specifically, as to the latter, the Debtor had sole authority to transfer money from the McMahan-Clemis Account into the Trinity Development Account and the McMahan Account. (Tr. Ex. 71 at 71:3–6; Tr. Ex. 73 at 106:6–107:9, 144:11–146:6.) Thus, any payments to the Debtor via money transfers from the McMahan-Clemis Account to the Debtor's personal account, including any distributions or payment of wages other than compensation, were made by and under the authority of the Debtor. (Tr. Ex. 71 at 70:1–73:12.)

Finally, on or about March 17, 2016, the Debtor opened a personal account ending in 1973 at Bank of America in his own name; that account was still open as of the Petition Date. (Dkt. 31

---

[9] McMahan-Clemis actually had two bank accounts, one which was used by the medical practice in connection with hearing aids and the other—the account in question—which was used by McMahan-Clemis for all other purposes. (Tr. Ex. 71 at 53:14–54:8.)

¶ 32; Tr. Ex. 63; Tr. Ex. 73 at 109:15–110:19.) Between May 2017 and May 2018, the McMahan

Account was the Debtor's only personal bank account, and he had no joint bank accounts with his

wife. (Tr. Ex. 71 at 53:1–13.) The Debtor had sole control over the flow of funds into and out of

the McMahan Account and was the only person who could sign checks, transfer or wire money,

and use the check card associated with the account. (Tr. Ex. 73 at 106:6–107:8, 125:1–9.)

### The Bank's State Court Citation Proceedings Following Entry of the Judgment

After entry of the state court Judgment on September 30, 2015, the Bank caused several

citations to discover assets to be issued to, among others, the Debtor and companies believed to be

owned and/or controlled by him, including McMahan-Clemis (the "Citation Proceedings"). (Dkt.

31 ¶ 17; Tr. Exs. 5, 7, 10, 13.) Initially, the Debtor retained the law firm of Cohon Raizes & Regal

LLP to represent him and McMahan-Clemis in the Citation Proceedings. (Tr. Ex. 73 at

59:17– 60:18.)

On October 19, 2015, the Bank issued two third-party citations to discover assets to

McMahan-Clemis. (Dkt. 31 ¶¶ 21, 24; Tr. Exs. 7, 10.) The first (the "McMahan-Clemis Citation")

was served by certified mail on the medical practice on October 26, 2015. (Dkt. 31 ¶ 23; Tr. Ex.

11.) The McMahan-Clemis Citation contained the following provision:

> **YOU ARE PROHIBITED** from making or allowing any transfer or other
> disposition of, or interfering with, any property not exempt from the enforcement
> of a judgment, a deduction order or garnishment, property belonging to the
> judgment debtor or to which s/he may be entitled or which may thereafter be
> acquired by or become due to him or her, and from paying over or otherwise
> disposing of any monies not so exempt, which are due to the judgment debtor. This
> prohibition shall remain in effect until further order of court or termination of the
> proceeding. You are not required to withhold the payment of any monies beyond
> double the amount of the total sum due the judgment creditor.

(Dkt. 31 ¶ 22.) The second was a citation to discover assets related to the wages of the Debtor (the

"McMahan-Clemis Wage Citation"). (Dkt. 31 ¶ 24; Tr. Ex. 7.) That citation was also served via

14

certified mail on McMahan-Clemis on October 26, 2015. (Dkt. 31 ¶ 26; Tr. Ex. 8.) The McMahan-

Clemis Wage Citation provided, in relevant part, as follows:

> **YOU ARE PROHIBITED** from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from the execution or garnishment belonging to Defendant or to which s/he may be entitled or which may thereafter be acquired by or become due to him or her, and from paying over or otherwise disposing of any moneys not so exempt which are due or become due to the Defendant, up to double the amount of the balance due, until further order of the court or termination of the proceeding, whichever occurs first.

(Dkt. 31 ¶ 25, Tr. Ex. 7.)

On November 10, 2015, the Bank then issued an alias citation to discover assets to the

Debtor (the "McMahan Citation"). (Dkt. 31 ¶ 18; Tr. Ex. 5.) The McMahan Citation contained the

following provision:

> **YOU ARE PROHIBITED** from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to the judgment debtor or to which the judgment debtor may be entitled or which may be acquired by or become due to the judgment debtor and from paying over or otherwise disposing of any money not so exempt, which is due or becomes due to the judgment debtor, until further order of court or termination of the proceedings. You are not required to withhold the payment of any money beyond double the amount of the judgment.

(Dkt. 31 ¶ 19; Tr. Ex. 5.) The citation was served on the Debtor on November 16, 2015. (Dkt. 31

¶ 20, Tr. Ex. 6.)

Thereafter, on November 25, 2015, the Bank issued an alias third-party citation to discover

assets on Trinity Development (the "Trinity Development Citation"), which was served on the

company via certified mail, as well as on the Debtor. (Tr. Exs. 13–15.) The Trinity Development

Citation provided, in pertinent part, as follows:

> **YOU ARE PROHIBITED** from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from the enforcement of a judgment, a deduction order or garnishment, property belonging to the judgment debtor or to which s/he may be entitled or which may thereafter be acquired by or become due to him or her, and from paying over or otherwise

15

disposing of any monies not so exempt, which are due to the judgment debtor. This prohibition shall remain in effect until further order of court or termination of the proceeding. You are not required to withhold the payment of any monies beyond double the amount of the total sum due the judgment creditor.

(Dkt. 31 ¶ 28.)

In response to the McMahan-Clemis Wage Citation, McMahan-Clemis completed and filed interrogatories/answers, which the Debtor signed as employer/agent on the respondent certification line on November 12, 2015. (Tr. Ex. 12; Tr. Ex. 73 at 39:16–42:21.) Subsequently, on April 1, 2017, McMahan-Clemis completed another set of interrogatories/answers, which the Debtor again signed as employer/agent. (Tr. Ex. 18; Tr. Ex. 73 at 46:11– 47:11.) In response to the Alias McMahan Citation, an "Income and Asset Form" was completed and served on the Bank, dated April 4, 2017, with a "verification by certification" signed by the Debtor. (Tr. Ex. 37; Tr. Ex. 73 at 28:15–29:15.)

Subsequently, on May 3, 2017, the state court entered a Wage Deduction Order/Turnover Order (the "wage deduction/turnover order") in favor of the Bank and against McMahan-Clemis in connection with the non-exempt gross wages of the Debtor. (Dkt. 31 ¶ 36; Tr. Ex. 41.) At some point after May 17, 2017, Debtor's counsel directed the Debtor to make payments to the Bank as required under the wage deduction/turnover order in the amount of $4,800 per month. (Tr. Ex. 72 at 143:11–144:8; 191:9–192:21.) As president of McMahan-Clemis, the Debtor himself made only four payments pursuant to the order. (*Id.* at 144:5–22, 191:9–192:4; Tr. Ex. 64 at LFB&T 695, 698, 718, 721, 758, 762, 778, 783.)

Both the citations and the wage deduction/turnover order, all of which were filed and served on the citation respondents by the Bank, entered on the state court docket, and served on the Debtor, were in effect throughout the year prior to the filing of the Debtor's chapter 7 bankruptcy case. (Tr. Exs. 19–21, 23–26, 28–31, 35, 38, 40, 42–45, 48–55, 57, 59–62.)

16

As early as July 12, 2017, the state court entered an order requiring the Debtor to appear and show cause as to why he should not be held in contempt for his various failures to respond to the citations and subsequently held him in contempt and issued a body attachment. (Tr. Exs. 22, 23, 44, 59.) The Debtor produced no evidence, and there was no evidence presented to the Court, that prior to the Petition Date, the Debtor ever sought relief from the state court declaring certain income or assets exempt from the Citation Proceedings or that any order was entered by the state court to that effect. The Debtor also failed to produce any evidence, and no evidence was presented to the Court, that before the filing of his chapter 7 bankruptcy case, the Debtor, on his own behalf or on behalf of McMahan-Clemis, ever sought relief or authority from the state court to make any transfers of money to and/or from the McMahan-Clemis Account, the Trinity Development Account, and the McMahan Account or to make any transfers to his wife Lynn McMahan.

**Transfers to and from the Relevant Bank Accounts in the Year Prior to the Petition Date**

Beginning at least as early as April 2016, the Debtor, in his individual capacity and as president of McMahan-Clemis, transferred significant sums of money to and from the McMahan-Clemis Account, the Trinity Development Account, and the McMahan Account. (Tr. Exs. 63–65, 70; Tr. Ex. 71 at 71:3–6; Tr. Ex. 73 at 101:15–17, 106:6–107:9, 125:1–9, 131:23–132:6, 135:14–136:5, 144:11–146:6.) Specifically, in the year prior to the Petition Date, between May 15, 2017 and May 14, 2018, the Debtor, in violation of the McMahan-Clemis Citation, the McMahan Citation, and the wage deduction/turnover order, made the following transfers to and from the McMahan-Clemis Account, the Trinity Development Account, and the McMahan Account, as well as to third parties (Dkt. 31 ¶ 56; Tr. Exs. 63–65, 70):

- Used the check card on the McMahan-Clemis Account for purchases and cash withdrawals for payments to the Debtor's third-party creditors, for personal, non-exempt purposes, and for the Debtor's own benefit in an amount in excess of **$29,849.40**. (Tr. Ex. 64 at LFB&T 654–666, 675, 693, 714–716, 738, 756,

17

796–797, 817–818, 837–838, 856–858, 875–877, 894–895.)

- Caused **$41,750.00** to be transferred electronically from the McMahan-Clemis Account to Trinity Development, including to the Trinity Development Account. (*Id.* at LFB&T 653–654, 672, 674, 692, 711–712, 734, 754–755, 773, 794–795; Tr. Ex. 65 at LFB&T 1010, 1018, 1034, 1048, 1056. 1064.)

- Transferred **$10,000.00** electronically from the McMahan Account to the McMahan-Clemis Account. (Tr. Exs. 63–64, 70.)

- Received money personally via online transfers from the McMahan-Clemis Account to the McMahan Account in the amount of **$406,550.00**. (Tr. Ex. 63 at LFB&T 231, 239, 247, 255, 263, 269, 285, 295, 313, 323, 335; Tr. Ex. 64 at LFB&T 653–654, 672–674, 691–692, 711–712, 733–734, 753–755, 773–775, 793–795, 814–815, 833–834, 854–855, 873–875, 892–893; Tr. Ex. 70.)

- Caused transfers of non-exempt property of the estate, in the amount of **$525,820.87**, to be made to third parties from the McMahan Account, for the Debtor or on his behalf, without obtaining a court order. (Tr. Exs. 63, 70.)

- Caused transfers of non-exempt property of the estate, in the amount of **$44,500.00**, to be made to his wife Lynn McMahan from the McMahan Account, without obtaining a court order. (Tr. Ex. 63 at LFB&T 234, 250, 264, 316, 328, 337.)

- Caused **$73,800.00** to be electronically transferred from the McMahan Account to the Trinity Development Account. (*Id.* at LFB&T 241–242, 250, 257, 264, 271–272, 287–288, 297–298, 315–316, 328, 337–338; Tr. Ex. 65 at LFB&T 1010, 1018, 1034, 1048, 1056, 1064, 1072, 1078, 1086, and 1090; Tr. Ex. 70.)

- Caused transfers of non-exempt property of the estate, in the amount of **$87,498.86**, to be made to third parties from the Trinity Development Account, for the Debtor or on his behalf. (Tr. Exs. 65, 70.)

**The State Court Judgment Against McMahan-Clemis for Violations of Citation Orders**

On May 15, 2018, the day after the Debtor filed his chapter 7 bankruptcy case, the state court conducted a hearing with respect to McMahan-Clemis's violations of the citation orders. (Dkt. 31 ¶ 67.) At that time, Judge Alexander P. White of the state court heard oral arguments and made certain findings of fact and conclusions of law. (*Id.*) These included the following, set forth in three related orders:

- The Bank issued a third-party citation to discover assets to McMahan-

18

Clemis on October 19, 2015, and that citation had been continually in full effect and remained in effect.

- The citation issued to McMahan-Clemis contained a provision barring McMahan-Clemis from making any transfers of non-exempt property or money to the Debtor.

- In violation of the McMahan-Clemis Citation, McMahan-Clemis transferred $436,886.98 to the Debtor.

- The transfer(s) violated the restraining provision of the McMahan-Clemis Citation.

- McMahan-Clemis violated the McMahan-Clemis Citation and may have violated the McMahan-Clemis Wage Citation.

- McMahan-Clemis had failed to cooperate and comply with the McMahan-Clemis Citation.

- McMahan-Clemis was found to be in contempt, and a judgment was entered against it due to its violation of the McMahan-Clemis Citation.

- McMahan-Clemis had taken no steps to ensure that the McMahan-Clemis Citation would not be violated.

- Pursuant to 735 ILCS 5/2-1402(f)(1), the state court had the authority to enter a judgment in favor of the Bank and against McMahan-Clemis in the amount of the unpaid portion of the Judgment or the value of the property transferred, whichever was less.

- The amount of the value transferred, $436,886.98, was the lesser amount.

(Tr. Exs. 60–62.) Based on these findings of fact and conclusions of law, the state court entered judgment in favor of the Bank and against McMahan-Clemis in the amount of $436,886.98 and held McMahan-Clemis in contempt of court. (Dkt. 31 ¶ 68; Tr. Exs. 60, 61.) Judge White also found that the violations were willful. (*Id.*)

**DISCUSSION**

In its Complaint, the Bank asserts that the Debtor should be denied a discharge under section 727(a)(2)(A) of the Bankruptcy Code. Specifically, the Bank alleges that in the year prior

19

to filing his chapter 7 bankruptcy case, the Debtor orchestrated a scheme in which he used the three bank accounts discussed above, over which he had exclusive control, to transfer and/or conceal in excess of $500,000. According to the Bank, the Debtor participated in this continuing course of action in order to hinder, delay, and defraud the Bank.

Section 727(a) denies a discharge to a debtor who has been unscrupulous in various ways. The bankruptcy system is designed to help the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991) (internal quotation omitted). Consequently, no discharge is available to the debtor who has been "less than honest." *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). Although the denial of a discharge is a "drastic" remedy, *Stathopoulos v. Bostrom (In re Bostrom)*, 286 B.R. 352, 359 (Bankr. N.D. Ill. 2002), *aff'd*, 2003 WL 403138 (N.D. Ill. 2003), discharge in bankruptcy is a privilege, not a right, *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 966 (7th Cir. 1999). A debtor who has not been honest and forthcoming does not deserve that privilege. *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996); *see also Mayer v. Spanel Int'l Ltd. (In re Mayer)*, 51 F.3d 670, 674 (7th Cir. 1995) (noting that "Congress concluded that preventing fraud is more important than letting defrauders start over with a clean state").

Objections to discharge under section 727(a) are construed strictly against creditors and liberally in favor of the debtor. *Sullivan v. Ratz*, 551 B.R. 338, 345 (N.D. Ill. 2016). A creditor seeking denial of discharge bears the burden of proving each of the elements of the applicable claim by a preponderance of the evidence. *Scott*, 172 F.3d at 966–67; *Muhammad v. Reed (In re Reed)*, 542 B.R. 808, 823 (Bankr. N.D. Ill. 2015); *see also* Fed. R. Bankr. P. 4005; *In re Meyers*, 616 F.3d 626, 631 (7th Cir. 2010) (explaining that "proof by a preponderance of the evidence means that the 'trier of fact must believe that it is more likely than not that the evidence establishes the proposition in question'"). Once the plaintiff "has established that the acts complained of

20

occurred, the burden of production shifts to the debtor who must then come forward with a

'credible explanation of his actions.'" *Neary v. Stamat (In re Stamat),* 395 B.R. 59, 69–70 (Bankr.

N.D Ill. 2008), *aff'd,* 2009 WL 2916834 (N.D. Ill. 2009), *aff'd,* 635 F.3d 974 (7th Cir. 2011).

A debtor's discharge may be denied under section 727(a)(2) when the debtor, "with intent

to hinder, delay, or defraud a creditor . . . , has transferred, removed, destroyed, mutilated, or

concealed . . . (A) property of the debtor, within one year before the date of the filing of the

petition[,] or (B) property of the estate, after the date of the filing of the petition[.]" 11 U.S.C.

§ 727(a)(2). The purpose of the statutory provision is to prevent the discharge of a debtor who tries

to avoid paying his creditors by concealing or otherwise disposing of his assets. *See Layng v. Hicks*

*(In re Hicks)*, Bankr. No. 15 B 26479, Adv. No. 16 A 00320, 2017 WL 1160871, at *12 (Bankr.

N.D. Ill. Mar. 24, 2017). To prevail under section 727(a)(2), a plaintiff must establish two

elements: "an act (i.e., a transfer or a concealment of property) and an improper intent (i.e., a

subjective intent to hinder, delay, or defraud a creditor)." *In re Kontrick*, 295 F.3d 724, 736 (7th

Cir. 2002) (internal quotation omitted), *aff'd on other grounds sub nom. Kontrick v. Ryan*, 540

U.S. 443 (2004).

**The Act: Transfer and Concealment of Funds**

The Bank's argument under section 727(a)(2) focuses on the Debtor's alleged transfer and

concealment of funds in violation of the various citations issued by the Bank, as well as the wage

deduction/turnover order entered by the state court, over the course of the Citation Proceedings.

The Bankruptcy Code defines "transfer," in relevant part, as "each mode, direct or indirect,

absolute or conditional, voluntary or involuntary, of disposing of or parting with . . . property[] or

. . . an interest in property." 11 U.S.C. § 101(54)(D). "Concealment," for purposes of section

727(a), includes "'preventing discovery, fraudulently transferring or withholding knowledge or

information required by law to be made known.'" *In re Marcus-Rehtmeyer,* 784 F.3d 430, 442 (7th Cir. 2015) (quoting *Scott,* 172 F.3d at 967).

When a citation to discover assets is served on a judgment debtor, "a lien is created in favor of the judgment creditor for all personal property that the debtor has or acquires by the time the court issues a disposition[.]"[10] *Id.* at 438–39 (citing 735 ILCS 5/2-1402(m)). Once a judgment debtor, or a third-party, is served with a citation to discover assets containing prohibiting language—like the language included in the Bank's citations—all transfers are prohibited. 735 ILCS 5/2-1402(f). To protect judgment debtors from such prohibitions, Illinois law allows them to seek "an expedited hearing to exempt income or assets from the citation." *First State Bank of Bloomington v. Cannell (In re Cannell*), Bankr. No. 12-71705, Adv. No. 12-07051, 2013 WL 2467787, at *5 (Bankr. C.D. Ill. June 7, 2013) (citing 735 ILCS 5/2-1402(b), (*l*)), *aff'd*, 2014 WL 3725929 (C.D. Ill. 2014)). "A judgment creditor does not have the burden of showing that an exemption is inapplicable"; instead, the judgment debtor must affirmatively assert an exemption. *In re Marriage of Takata and Hafley*, 890 N.E.2d 688, 692–93 (Ill. App. Ct. 2008) (citing *Dowling v. Chi. Options Assocs., Inc.*, 847 N.E.2d 741, 747 (Ill. App. Ct. 2006)). "There is no statutory exception for transfers made in the ordinary course of business." *City of Chi. v. Air Auto Leasing Co.,* 697 N.E.2d 788, 791 (Ill. App. Ct. 1998) (internal citation omitted). Further, once a judgment debtor deposits his wages into a bank account, the funds are subject to the citation and, thus, "become fair game for creditors." *In re Jokiel*, No. 09-B-27495, 2012 WL 33246, at *3 (Bankr. N.D. Ill. Jan. 5, 2012) (internal quotation omitted).

As outlined in detail *supra*, in the year before the Petition Date, the Debtor devised a

---

[10] In this matter, the limits on transfer created by the service of a citation to discovery assets are governed by Illinois law. *See First State Bank of Bloomington v. Cannell (In re Cannell)*, Bankr. No. 12-71705, Adv. No. 12-07051, 2013 WL 2467787, at *4 (Bankr. C.D. Ill. June 7, 2013), *aff'd*, 2014 WL 3725929 (C.D. Ill. 2014).

scheme involving three bank accounts over which he had sole control to transfer and/or conceal more than $500,000. These transfers were all made during the pendency of, and in violation of, the citations issued by the Bank and the wage deduction/turnover order entered by the state court. All of the transfers were made by the Debtor in his individual capacity or as president of McMahan-Clemis. The Debtor failed to produce any evidence that he ever sought permission from the state court to make the transfers or to claim an exemption for the funds at issue. Thus, Court finds that the Debtor transferred or concealed his property within one year before the date of the filing of the chapter 7 bankruptcy petition. Accordingly, the Bank has established the first element under section 727(a)(2)(A).

### Intent to Hinder, Delay, or Defraud the Bank

The second element required under section 727(a)(2) is intent. Specifically, a debtor's discharge will not be denied unless the complaining creditor "demonstrates by a preponderance of the evidence that the debtor actually intended to hinder, delay, or defraud a creditor[;] . . . [the] intent to defraud must be actual and cannot be constructive." *In re Kempff*, 847 F.3d 444, 448 (7th Cir. 2017) (internal quotation omitted). The issue of a debtor's intent is a question of fact to be determined by the court. *Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562, 566 (7th Cir. 1989).

The Bankruptcy Code does not define "hinder" or "delay." However, "hinder" has been defined by courts to mean "conduct that impedes or obstructs a creditor." *See, e.g., Cannell*, 2013 WL 2467787, at *3 (citing *Crews v. First Colony Life Ins. Co. (In re Barker)*, 168 B.R. 773, 779 (Bankr. M.D. Fla. 1994)). "Delay," in turn, generally refers to "putting off to a future time" or "postpon[ing]." *Id.* (citing *Webster's New World College Dictionary* 381 (4th ed. 2002)). Under Illinois law, transfers made in violation of a citation to discover assets support a finding of the

23

debtor's intent to hinder and delay a creditor. *See, e.g., id.* at *5–6.

As for fraud, because a debtor is unlikely to admit his fraudulent intent, a finding of actual intent may be inferred from the surrounding circumstances. *McWilliams,* 284 F.3d at 790–91; *In re Snyder*, 152 F.3d 596, 601 (7th Cir. 1998); *In re Krehl*, 86 F.3d 737, 743 (7th Cir. 1996). Certain factors, or "badges" of fraud, "may warrant the inference." *Cohen v. Olbur (In re Olbur)*, 314 B.R. 732, 744 (Bankr. N.D. Ill. 2004). These include a familial or close relationship between the parties; a lack of consideration for the transfer; the debtor's retention of possession, benefit, or use of property; the debtor's financial condition; and the general chronology of the events and transactions in question. *McWilliams*, 284 F.3d at 791; *Olbur*, 314 B.R. at 744. Also relevant here is "the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors." *McWilliams*, 284 F.3d at 791 (internal quotation omitted). Although just one of these badges is sufficient to establish fraudulent intent, the presence of several factors "indicates strongly that [the] debtor possessed the requisite intent." *Jeffrey M. Goldberg & Assocs., Ltd. v. Holstein (In re Holstein)*, 299 B.R. 211, 230 (Bankr. N.D. Ill. 2003) (internal quotation omitted), *aff'd*, 2004 WL 2075442 (N.D. Ill. 2004). In deciding whether a debtor has acted with intent for purposes of section 727(a)(2), the court should consider the debtor's "whole pattern of conduct." *Richardson v. Clarke (In re Clarke)*, 332 B.R. 865, 870 (Bankr. C.D. Ill. 2005) (internal quotation omitted).

At a minimum, the transactions discussed in this matter "hindered" the Bank in its collection efforts and "delayed" the Bank's ability to collect on its Judgment against the Debtor. These transactions, all of which violated the citations issued by the Bank, support a finding that the Debtor made the transfers with the intent to hinder or delay the Bank. *See, e.g., Cannell*, 2013 WL 2467787, at *5 (finding that a debtor's failure to seek approval of proposed transfers or to

24

claim an exemption for such funds "is evidence of his intent to hinder or delay").

Multiple badges of fraud establish the Debtor's intent to defraud as well. First, there was both a familial and close relationship between and among the principal participants in this matter. Although McMahan-Clemis and Trinity Development had no working relationship, the Debtor was the sole shareholder and president of McMahan-Clemis during the year prior to the filing of his chapter 7 case, and his wife Lynn McMahan was both president and a shareholder of Trinity Development during the relevant time. In addition, there was no consideration given for the transfers from the McMahan-Clemis Account to either the Trinity Development Account or the McMahan Account. Rather, the Debtor, as president of McMahan-Clemis, made the transfers effectively to himself whenever he needed money. (Tr. Ex. 71 at 59:19–60:5.) He also made transfers totaling $44,500 directly to his wife. By making these transfers to himself and his family, the Debtor retained the possession, benefit, and use of the funds. Finally, the general chronology of events and transactions and the cumulative effect of the pattern of transactions and the Debtor's course of conduct weigh in favor of a finding of fraudulent intent. That is, despite the language in the citations issued by the Bank prohibiting the transfer or other disposition of the Debtor's non-exempt property, the Debtor transferred large sums of money to and from the three bank accounts over which only he had control. Likewise, the Debtor violated the wage deduction/turnover order entered by the state court in favor of the Bank and against McMahan-Clemis, making only four payments to the Bank pursuant to that order. Both the citations and the order were all in effect throughout the year prior to the filing of the Debtor's chapter 7 case.

In sum, the cumulative evidence establishes virtually all of the badges of fraud required for a finding that the Debtor intended to hinder, delay, or defraud his creditors. The Debtor has not presented any evidence to the contrary. Only an "honest but unfortunate debtor" is entitled to the

25

privilege of a discharge. The Debtor here is neither honest nor unfortunate. Throughout the year prior to the filing of his chapter 7 bankruptcy case, he intentionally transferred his income and assets in order to defraud his creditors and ensure that the Bank would not able to reach any of his substantial funds for payment of its Judgment.

**CONCLUSION**

For the foregoing reasons, the Court finds in favor of the Bank and against the Debtor, and the Debtor's discharge will be denied pursuant to section 727(a)(2)(A) of the Bankruptcy Code. A separate order will be entered consistent with this Memorandum Opinion.

DATED: **October 30, 2024**                    ENTERED:

                                               _____
                                               Janet S. Baer
                                               United States Bankruptcy Judge